Benjamin GAFFIN, on behalf of himself and all other persons similarly situated, Appellant,

v.

TELEDYNE, INC., a corporate entity, Appellee.

Supreme Court of Delaware.

Submitted: May 19, 1992.
Decided: August 26, 1992.

Thomas Herlihy, III, Herlihy, Harker & Kavanaugh, Wilmington, David Daar and Jeffery J. Daar, Daar & Newman, and Erwin Sobel (argued), Law Offices of Erwin Sobel, Los Angeles, Cal., for appellant.

A. Gilchrist Sparks, III (argued), Kenneth J. Nachbar, Morris, Nichols, Arsht & Tunnell, Wilmington, and Gregory R. Smith, Jonathan H. Steinberg and Robert G. Martin, Irell & Manella, Los Angeles, Cal. for appellee.

Before VEASEY, C.J., HORSEY and WALSH, JJ.

VEASEY, Chief Justice:

This is an appeal from a decision of the Court of Chancery awarding damages in the amount of $1 per share to the plaintiff class (the "class") arising from alleged equitable fraud in connection with the repurchase offer of defendant, Teledyne Inc.

("Teledyne") for its own common stock. The class appeals from that which it claims to be an inadequate award. Teledyne has cross-appealed only insofar as the Court of Chancery has certified the plaintiff class and refused to decertify the same. Teledyne has not cross-appealed the damage award of $1 per share. The primary contention of the plaintiff class is that they were deprived of the right to make an informed decision in connection with their decision whether or not to tender their shares, and that, accordingly, Teledyne committed common law fraud.[1] Plaintiff claims that the frauds allegedly committed by Teledyne were "egregious" in nature rather than only "marginally significant" as determined by the Court of Chancery. In addition, the class contends that the court erred: a) by ruling that plaintiff failed to show that members of the class would not have tendered their shares absent the disclosure violations since the court had already determined that there was a rebuttable presumption of class-wide reliance; b) by excluding arbitragers from the class; and c) by denying plaintiff's claim for prejudgment interest.

Teledyne contends that each of plaintiff's contentions should be rejected. In its cross-appeal, Teledyne contends that the court erred by failing to decertify the class and erred, in any event, by awarding class-wide damages because reliance could not be, and was not, proven on a class-wide basis.

We reverse the decision of the trial court refusing to decertify the class, leaving intact, however, the award of $1 per share to plaintiff Gaffin individually. We conclude that the Court of Chancery erred by failing to decertify the class since this is a common law fraud case and individual questions of law or fact concerning each individual shareholder's justifiable reliance predominated over any questions of law or fact common to the class. In addition, we conclude that the court erred by awarding damages to the class since individual shareholder justifiable reliance was not proven on a class-wide basis. Therefore, the decisions of the Court of Chancery in refusing to decertify the class and the class-wide award of damages are reversed. Plaintiff Gaffin's individual claim and the award of $1 per share in damages to Gaffin remains intact, however, because Teledyne did not cross-appeal the finding of $1 per share in damages.

## FACTS

This individual and purported class action is brought by Benjamin Gaffin on behalf of himself and former shareholders of Teledyne who are "similarly situated." Plaintiff's claim arises out of alleged disclosure violations in connection with a repurchase offer made by Teledyne for its common stock on February 9, 1976. Teledyne is a Delaware corporation with its principal place of business in Los Angeles, California. Teledyne became a diversified conglomerate during the 1960s and was primarily engaged in the production and sale of industrial aviation, electronic, and specialty products. By 1969, Teledyne owned approximately 130 companies. By 1971, the number of outstanding shares of Teledyne common stock was approximately 37.5 million shares.

From September 1972 to February 9, 1976 (the date of the Offering Circular at issue in this case), Teledyne offered its shareholders six opportunities to convert Teledyne common stock into cash or debentures. Of the six repurchase offers, four involved exchanges for cash and two involved exchanges for debentures. Teledyne engaged in this series of self-tender offers apparently because it viewed the shares as a good investment. As a result of this series of repurchases, Teledyne ultimately reduced the number of outstanding common shares from a high of 37.5 million shares in 1971 to approximately 13.6 million shares by January 1976.

Each of the repurchase offers was made pursuant to offering circulars which con-

---

**1.** For purposes of this opinion, we use the terms "equitable fraud" and "common law fraud" in-

terchangeably; *but see* note 4 *infra.*

tained little information beyond the bare terms and mechanics for acceptance. Significantly, Teledyne believed that, so long as a corporation promptly and adequately disclosed material corporate developments in public filings and press releases, it was unnecessary to repeat or summarize recent corporate developments in the offering circular. Teledyne believed that to do so created the risk of inadvertently "coloring" the publicly available information.[2] Each repurchase offer contained a commitment by Teledyne to purchase a minimum number of shares, but Teledyne reserved the right to purchase additional shares if the offer was oversubscribed. Although five of the six repurchase offers were significantly oversubscribed, Teledyne purchased all shares tendered in each offer. The offering price in each cash exchange offer was approximately 25 percent above the price at which Teledyne stock had been trading immediately prior to the announcement of the repurchase offer.

The circumstances surrounding the five repurchase offers preceding the February 1976 repurchase offer at issue in this case may be summarized briefly as follows. The first repurchase offer was announced on September 15, 1972. The repurchase offering price was $20 per share, with Teledyne committing itself to repurchase up to one million shares and reserving the right to purchase more shares, if tendered. Teledyne accepted all 8.9 million shares tendered. Thereafter, in the six-month period from November 1972 through May 1973, the price of Teledyne's stock declined almost 50 percent from a high of $23 per share to a low of $12 per share.

The second repurchase offer was announced on December 13, 1973, when Teledyne's stock was trading below $11 per share. The repurchase offering price was $14 per share, with Teledyne committing itself to repurchase up to four million shares, again reserving the right to take more shares if tendered. The public response to the second offer was less enthusiastic, however. After twice extending the duration of the offer, Teledyne ultimately accepted the 1.6 million shares tendered. By May 1974, the market price of Teledyne stock had again fallen below $11 per share, notwithstanding the fact that the number of Teledyne shares outstanding had been reduced by over 10.5 million shares.

The third repurchase offer was announced on May 31, 1974. Teledyne offered to repurchase shares in exchange for subordinated debentures with a $20 face amount and bearing 10 percent interest. Again, Teledyne pledged to purchase up to one million shares, reserving the right to purchase more if the offer was oversubscribed. Teledyne accepted all of the approximately four million shares tendered. By December 3, 1974, Teledyne stock was trading at less than $8 per share.

The fourth repurchase offer was announced on December 4, 1974. Teledyne offered to purchase up to one million shares in exchange for debentures with a $16 face amount and bearing 10 percent interest. Teledyne accepted all 1.9 million shares tendered. By April 16, 1975, Teledyne stock was trading below $10 per share.

The fifth repurchase offer was announced on April 30, 1975 when the market price of Teledyne stock was $12¼ per share. Teledyne offered to purchase up to one million shares and ultimately accepted all 3.6 million shares tendered.

Before addressing the February 1976 repurchase offer at issue in this case, it must be noted that 1975 turned out to be "a banner year" for earnings for Teledyne. Teledyne's earnings for the third quarter ending September 30, 1975, were nearly $25 million, up from $14 million in the comparable quarter for 1974. Teledyne attributed much of the increase in earnings to a reversal of serious financial problems which had been plaguing Teledyne's insurance subsidiaries. By late December 1975, Teledyne's stock was trading at a nearly

---

**2.** We express no view, as a matter of disclosure law, on the propriety of Teledyne's decision, since that issue is not before us.

five-year high of approximately $20 per share and by January 29, 1976, was trading around $30 per share. On January 29, 1976, Teledyne issued a press release announcing its record 1975 year end earnings of $6.09 per share. On this date, the market price of Teledyne stock increased to almost $34 per share. By February 5, 1976, however, Teledyne's stock had fallen to $32 per share.

The repurchase offer at issue in this case was announced on Friday, February 6, 1976, when Teledyne stock was trading at $32⅞ per share. Teledyne offered to purchase up to one million shares, with an option to accept more, if tendered, at $40 per share. The offering circular mailed to Teledyne shareholders on February 9, 1976, did not mention that Teledyne's 1975 Annual Report would be forthcoming. Teledyne's Annual Report was subsequently delivered to numerous brokerage houses on February 18, 1976, and was sent by first class mail to all Teledyne shareholders on February 18, 19, and 20, 1976. Unlike the immediate rise in the market price of Teledyne stock following the January 29, 1976 press release concerning Teledyne's 1975 increased earnings, there was no significant market reaction following the release of the Annual Report. On February 25, 1976, Teledyne declared its annual 3 percent stock dividend which also had no visible impact on Teledyne's stock price.

Prior to the initial release of the Annual Report on February 18, 1976, only 19,000 shares had been tendered. An additional 66,000 shares were tendered on February 18, 1976. The vast majority of shares, however, were tendered just prior to the close of the repurchase offer on February 27, 1976, including the 1.1 million shares tendered by the trustee of the Teledyne pension plan on February 26, 1976.

The following events occurred on March 1, 1976. First, Teledyne announced that it would accept all 2.5 million shares tendered. Second, the Becker Securities Corporation, relying upon the just released Annual Report, issued a bullish report predicting that the market price of Teledyne stock would increase to $70 during the next 12 months. Third, the market price of Teledyne's stock increased from $39.50 per share to nearly $47 per share.

During the six weeks following the February 1976 repurchase offer, Teledyne stock traded between a high of $52½ on March 23, 1976, and a low of $42¾ on April 15, 1976. Upon release of Teledyne's 1976 first quarter results, Teledyne stock returned to the low $50s. In May 1976, pursuant to permission obtained from the Securities and Exchange Commission in January 1976, Teledyne commenced purchasing shares in the open market. These purchases continued during the following months. On July 16, 1976, Teledyne announced second quarter earnings of $31.9 million compared to $22.9 million for the second quarter in 1975, which announcement sent Teledyne's stock price into the high $70s. In September and early October 1976, Teledyne's stock continued to trade in the low to middle $70s.

## COURT OF CHANCERY DECISION TO CERTIFY THE CLASS

The present case was filed in the Delaware Court of Chancery in January 1979, *sub nom.*, *Botney v. Teledyne, Inc.*, Del. Ch., C.A. No. 5786–NC (Jan. 18, 1979). Prior to the filing of this case in the Court of Chancery, four purported class actions had previously been filed against Teledyne in the United States District Court for the Central District of California. Those actions alleged, inter alia, fraud in connection with the February 1976 repurchase offer. Each of the prior cases was dismissed with prejudice, two on motions for summary judgment.[3] The original class representa-

---

3. *See Josephs v. Teledyne*, No. 76–4066–R (C.D.Cal. Jan. 4, 1978) (the court granted summary judgment in defendant's favor, finding that "[n]one of the defendants engaged in any fraudulent, deceptive, or manipulative act or practice"); *Kline v. Teledyne*, No. 77–4375–R (C.D.Cal. Sept. 4, 1978) (summary judgment granted in defendant's favor); *Yntema v. Teledyne*, No. 77–4374–R (C.D.Cal. Aug. 11, 1978) (action voluntarily dismissed while defendant's motion for summary judgment pending); and *Huey v. Teledyne*, 608 F.2d 1234 (9th Cir.1979), 662 F.2d 621 (9th Cir.1981) (dismissed for failure to prosecute; affirmed on appeal).

tive in the present case, Mr. Botney, was eventually dismissed as the putative class representative and Mr. Gaffin was permitted to intervene in his place. *Botney v. Teledyne, Inc.*, Del.Ch., C.A. No. 5786–NC, Hartnett, V.C. (April 24, 1985). Subsequently, the Court denied Teledyne's motion to dismiss or for summary judgment and certified a class "consisting of all the owners who tendered their shares to Teledyne in response to the repurchase offer except the Teledyne Pension Plan Trust." *Gaffin v. Teledyne, Inc.*, Del.Ch., C.A. No. 5786–NC, slip op. at 11, Hartnett, V.C., 1987 WL 18430 (Oct. 9, 1987).

The prerequisites for certifying a class are set forth in Court of Chancery Rule 23. Rule 23(a) provides:

> **(a) Requisites to Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Where the prerequisites of Rule 23(a) are satisfied, a class action may be maintained pursuant to Rule 23(b) if, in addition:

> (3) The Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matter pertinent to the findings include:
>
> (A) The interest of members of the class in individually controlling the prosecution or defense of separate actions;
>
> (B) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
>
> (C) The desirability or undesirability of concentrating the litigation of the claims in the particular forum;
>
> (D) The difficulties likely to be encountered in the management of a class action.

Court of Chancery Rule 23(b)(3).

In its decision certifying the class in this case, the trial court rejected Teledyne's contention that the class should not be certified because individual questions of law or fact concerning the element of individual shareholder justifiable reliance predominate over common questions of law or fact. *Gaffin*, Del.Ch., C.A. No. 5786–NC, slip op. at 12, Hartnett, V.C., 1987 WL 18430 (Oct. 9, 1987). The court also rejected Teledyne's contention that the claims of the class representative are atypical of the class claims because different shareholders possessed different levels of information prior to tendering their shares. According to Teledyne, at least two types of shareholder plaintiffs were involved in this case, each possessing different levels of information concerning Teledyne's financial status: 1) "sophisticated shareholders" and 2) all "other shareholders." The trial court determined, however, that the differences in the questions of law or fact as to the different types of shareholder plaintiffs were not material since "it did not matter whether there were precisely identical questions of law and fact present as to all members of the class; it was the general course of conduct complained of which served to unite the different class members." *Id.* (citing *Kaufman v. Lawrence*, 76 F.R.D. 397 (S.D.N.Y.1977). The court stated that, "[r]egardless of any alleged investment experience of institutional investors or arbitrageurs, [Teledyne] committed the same acts in the same method against the entire class and the members of both groups have identical claims." *Id.* at 13–14. The court recognized, however, that if it was determined during the course of the litigation that certain groups within the certified class had attained complete knowledge as to the material facts concerning the repurchase offer before tendering their shares, the court could divide the class into subclasses at that time. *Id.* at

14. The court found no such occasion to divide the class into subclasses at trial.

## DECISION OF THE COURT OF CHANCERY FOLLOWING TRIAL ON THE MERITS

 This case is quite unusual, perhaps unique. Plaintiff's claims at trial were based entirely on common law fraud.[4] There is no "fraud on the market" claim.[5] The only defendant is the corporate entity, Teledyne, so there are no fiduciary duty claims. The elements of a common law fraud (or deceit) cause of action consist of:

1) a false representation, usually one of fact, made by the defendant;

2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;

3) an intent to induce the plaintiff to act or to refrain from acting;

4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and

5) damage to the plaintiff as a result of such reliance.

*Stephenson v. Capano Development, Inc.,* Del.Supr., 462 A.2d 1069, 1074 (1983). As the trial court recognized, fraud does not consist merely of overt misrepresentations, but "may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak." *Gaffin,* Del.Ch., C.A. No. 5786–NC, slip op. at 16, Hartnett, V.C., 1990 WL 195914 (Dec. 4, 1990) (quoting *Stephenson,* Del.Supr., 462 A.2d at 1074 (citations omitted). "[T]here is no requirement that the defendant have known or believed its statement to be false or to have made the statement in reckless disregard of the truth. Rather, equity provides a remedy for negligent or innocent misrepresentations." *Id.*

In the context of a class action, however, establishing the fourth element of the eq-

uitable fraud cause of action—that plaintiff acted in justifiable reliance on the misrepresentation—is particularly problematic. In order to satisfy this element in the present case, the trial court ruled that a rebuttable presumption of class-wide shareholder reliance was established by the facts that: a) each class member received the offering circular which failed to contain material financial information; and b) each shareholder tendered shares by signing off on the offering circular's "Letter of Transmittal." *Id.* at 42.

Plaintiff's primary contention at trial was that Teledyne made false, misleading or incomplete disclosures in its February 1976 offering circular, and that it withheld its 1975 Annual Report so that it could not be timely considered by its shareholders who were considering the repurchase offer. *Id.* at 15. Teledyne defended on the basis that all relevant financial information concerning Teledyne's recent significant increase in earnings was already present in the "total mix" of information available to all shareholders via prior press releases and public filings. Therefore, Teledyne contended that it should not be held liable for failing to repeat this information in the offering circular. Moreover, even if its "total mix" defense failed, Teledyne contended that its disclosure violations were cured by the subsequent release of its 1975 Annual Report nine days before the close of Teledyne's self tender offer. *Id.* at 35.

The trial court ultimately rejected Teledyne's total mix and cure defenses, and ruled that Teledyne had failed to rebut the presumption of class-wide reliance. The trial court found that Teledyne had failed to show that "substantially all of its shareholders received the 1975 Annual Report before the close of the Offer, or that those shareholders who received the [Annual Report] had adequate time to consider the information" in order to make an informed

---

**4.** This Court has previously recognized that the only difference between common law fraud and equitable fraud is "Chancery's willingness to provide a remedy for negligent or innocent misrepresentations." *Stephenson v. Capano Development, Inc.,* Del.Supr., 462 A.2d 1069, 1074 (1983) (citations omitted).

**5.** *Compare Deutschman v. Beneficial Corp.,* 132 F.R.D. 359, 379–80 (1990) (class action involving federal securities claims which also discusses the problems presented when class certification of pendent common law fraud claims is sought).

decision to tender or not. *Id.* at 31. The court also found that Teledyne had failed to show that the most recent financial information had been made directly available to the other shareholders or that the information disclosed in the press releases and public filings "was the type of information of which [the other] shareholders are 'presumably aware.'" *Id.* at 32–33 (citations omitted).

As a result, the Court of Chancery concluded that Teledyne was guilty of equitable fraud in that its February 1976 Tender Offering Circular "did not adequately disclose to its stockholders all the material facts a stockholder reasonably needed to make a fully informed decision whether or not to tender." *Id.* at 2. This ruling was based on the court's conclusion that Teledyne had made the following material misdisclosures or omissions in connection with the tender offer:

(1) Teledyne failed to disclose in the offering circular that the purpose of its repurchase offer was to make a "sound investment." The court determined that this omission was material "because there is a substantial likelihood that disclosure of the purpose would have been viewed by a reasonable shareholder as significantly altering the total mix of information available."

*Id.* at 26.

(2) The offering circular was slightly misleading when it stated that the repurchase offer was not open to Teledyne's officers and directors when, in fact, the offer was technically open to Teledyne's two most senior officers albeit in their capacity as trustees in charge of Teledyne's pension plan trust which held and ultimately tendered 1.1 million shares. The court determined that this misdisclosure was material because the undisclosed control of these shares arguably gave Teledyne the power to cause a proration of the number of shares accepted in the tender offer, a fact that "would have assumed actual significance in the deliberations of a reasonable shareholder."

*Id.* at 18–19.

(3) Teledyne failed to include material financial information in the offering circular "when it knew or should have known that the information in its 1975 Annual Report would not likely be received in sufficient time to aid stockholders in considering the Tender Offer".

*Id.* at 31. Notwithstanding these material "disclosure failures", the court further concluded that: (a) the disclosure omissions were of only "marginal significance"; [6] (b) plaintiffs had failed "to show with certainty the amount of damage to each member of the class or ... that any significant number of tendering stockholders would not have tendered if they had received the [desired] information before the closing of the Tender Offer" (i.e., lack of proximate causation); and (c) rescissionary damages were inappropriate. *Id.* at 47–49.

In an attempt to fashion an appropriate remedy, the trial court recognized that there is precedent for "awarding monetary damages to a shareholder class where the shareholders suffered an injury because they were deprived of their right to make an informed decision regarding a corporate transaction, even without a showing of rescissionary or compensatory damages with certainty." *Id.* at 50 (citing *Weinberger v. UOP, Inc.,* Del.Ch., C.A. No. 5642–NC, Brown, C., 1985 WL 11546 (Jan. 30, 1985), *aff'd,* Del.Supr., 497 A.2d 792 (1985) (Order)). The court ultimately determined that an award of damages to the class in the amount of $1 per share was appropriate. The court expressly excluded that portion of the class which consisted of arbitragers on the basis that the evidence showed that the arbitragers "were not interested in any of the disclosures or omissions at issue in this litigation, and that such information would not have affected their decisions to tender." *Id.* at 50–51. In a revised order dated November 7, 1991,

---

**6.** The Vice Chancellor used terms such as "marginal significance" (slip op. at 2) and "slightly misleading" (*Id.* at 19). In view of our holding in this case, it is not necessary for us to comment on the legal significance, if any, of such characterizations insofar as they may purport to describe "degrees" of disclosure violations.

the court further ruled that the recovery of each class member shall be with interest at 12 percent from December 4, 1990.

## THE CLASS CERTIFICATION QUESTION

 In its cross-appeal Teledyne contends that the trial court erred by failing to decertify the class and by awarding class-wide damages because reliance could not be, and was not, proven on a class-wide basis. When reviewing the formulation and application of legal precepts made by the Court of Chancery, the standard of appellate review is *de novo*. *Nationwide Mut. Ins. Co. v. Starr*, Del.Supr., 575 A.2d 1083, 1086 (1990). For the reasons stated below, we conclude that the trial court erred: a) by failing to decertify the class as to the question of individual shareholder justifiable reliance; and b) by awarding damages on a class-wide basis since the findings of fact made by the trial court demonstrate that individual shareholder justifiable reliance was not proven on a class-wide basis.

 A class action may not be maintained in a purely common law or equitable fraud case since individual questions of law or fact, particularly as to the element of justifiable reliance, will inevitably predominate over common questions of law or fact.[7] *See, e.g., In re One Bancorp Sec. Litig.*, 136 F.R.D. 526, 533 (D.Me.1991) (fraud-on-the-market presumption of reliance is not available in state law fraud claims; "proof of individualized reliance from each member of the proposed plaintiff class effectively ... prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones") (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 242, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988)); *Katz v. Comdisco, Inc.*, 117 F.R.D. 403, 412 (N.D.Ill.1987) (common law fraud claims do not lend themselves to class action treatment; common law actions for fraud and negligent misrepresentation require each individual plaintiff to prove that he or she relied on the alleged misrepresentation; "individual issues of reliance would predominate over any common questions"); *Gavron v. Blinder Robinson & Co.*, 115 F.R.D. 318, 325 (E.D.Pa.1987) ("common law fraud count raises numerous issues which are personal to each plaintiff and are, therefore, uncommon to the class as a whole; since individual issues, not common issues, predominate, certification denied); *Beebe v. Pacific Realty Trust*, 578 F.Supp. 1128, 1151–52 (D.Ore.1984) (common law fraud and negligent misrepresentation claims require proof of individual reliance; certification refused).[8] We agree with the

**7.** In view of this holding, we need not address the ruling of the Court of Chancery that Delaware does not follow the *lex loci delicti* doctrine "in corporate tender offer disclosure cases where it would, as a matter of practicality, be impossible to examine each stockholder and the law of each state of each stockholder." *Gaffin*, Del.Ch., C.A. No. 5786–NC, slip op. at 41, Hartnett, V.C., 1990 WL 195914 (Dec. 4, 1990) (citing *Lynch v. Vickers Energy Corp.*, Del.Supr., 429 A.2d 497 (1981); 8 *Del.C.* § 169). In support of its contention that individual questions of law and fact predominate over common questions of law and fact in this case, Teledyne had argued that the court must consider and apply the law of the state of each class member under the *lex loci delicti* doctrine. Other courts which have addressed this issue generally consider the presence of the choice of law issues as a factor weighing against class certification of common law fraud claims. *See, e.g., Deutschman v. Beneficial Corp., supra* n. 5, 132 F.R.D. at 380; *In re Consumers Power Company Securities Litigation*, 105 F.R.D. 583, 609 (1985); *Simon v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 482 F.2d 880, 883 (5th Cir.), *reh'g denied*, 485 F.2d 687 (5th Cir.1973).

**8.** There is another line of cases in which some federal courts have certified both federal securities claims and *pendent* common law fraud claims where plaintiffs' common law fraud and federal securities claims are based on the same course of conduct by defendants. *See Deutschman v. Beneficial Corp., supra* n. 5, 132 F.R.D. at 379 (citing *Worlds of Wonder Sec. Lit.*, [1989–1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,004 at 95,628–629, 1990 WL 61951 (N.D.Cal. 1990)); *Dowling v. Narragansett Capital Corp.*, 735 F.Supp. 1105, 1113 (D.R.I.1990); *Grace v. Perception Technology Corp.*, 128 F.R.D. 165, 171–72 (D.Mass.1989); *In re Boardwalk Marketplace Sec. Lit.*, 122 F.R.D. 4, 8 (D.Conn.1988); and *In re United Energy Corp., Etc. Sec. Lit.*, 122 F.R.D. 251 (C.D.Cal.1988). Such cases are readily distinguishable from the present case, however, since they are primarily based on federal securities law violations.

holdings of these cases and conclude that the trial court erred by failing to decertify the class because of the inherently individual issue involving the element of justifiable reliance in this purely common law equitable fraud case.

■ As stated above, we also conclude that the trial court erred by awarding damages on a class-wide basis since the court's own findings of fact demonstrate that any presumption of class-wide justifiable reliance was rebutted notwithstanding the court's conclusion to the contrary. In *Gaffin*, Del.Ch., C.A. No. 5786–NC, Hartnett, V.C., 1990 WL 195914 (Dec. 4, 1990), the trial court made the following findings of fact:

1) The offering circular dated February 9, 1976 made no mention that Teledyne's 1975 Annual Report would be forthcoming.

Slip op. at 9.

2) 9500 Annual Reports were hand delivered to New York nominees and brokers on February 18, 1975, nine days before the close of the tender.

*Id.* at 30.

3) The Annual Reports were sent by first class mail to "all other shareholders" on February 18, 19, and 20.

*Id.* at 9.

4) Highly *sophisticated shareholders* "likely knew of the January 29, 1976 press release setting forth Teledyne's 1975 year-end increased earnings.

*Id.* at 35.

5) As to *all other shareholders*, "many had likely received the 1975 Teledyne Annual Report just prior to the close of the Tender Offer."

*Id.* at 31.

These facts demonstrate that the presumption of class-wide reliance was rebutted as to both the "sophisticated shareholders" and "all other shareholders." The trial court found that the Annual Reports had been hand-delivered to the "sophisticated shareholders" well in advance of the closing date and that these "sophisticated shareholders" were presumably or likely aware of the most recent financial information via the press releases and public filings. The presumption of justifiable reliance was rebutted as to the "sophisticated shareholders" since the court found that the sophisticated shareholders presumably had knowledge of the most recent financial information on Teledyne. In addition, since "many" of the "other shareholders" likely had received the Annual Report before the close of the repurchase offer, it is reasonable to assume that at least some of the "other shareholders" had considered the updated financial information while others arguably at least had an adequate period of time in which to consider the updated information. *See* 37 Am.Jur.2d § 448, § 479 ("certain facts and circumstances can give rise to a presumption *against* reliance such as where there is an opportunity to learn the truth by the use of accessible means of information"). As to all "other shareholders" in the class, therefore, significant individual questions concerning the level of knowledge possessed by each shareholder existed and, therefore, any presumption of justifiable reliance as to "all other shareholders" was rebutted as well. Thus, individual shareholder justifiable reliance on the terms of and omissions from the offering circular in connection with the decision to tender Teledyne shares was not proven on a class-wide basis. Therefore, the decisions of the Court of Chancery in refusing to decertify the class and in awarding damages on a class-wide basis are reversed.

## THE AWARD OF $1 PER SHARE

In an attempt to fashion an appropriate remedy in this case, the trial court placed particular reliance on the Chancellor's decision on remand in *Weinberger v. UOP, Inc.*, Del.Ch., C.A. No. 5642–NC, Brown, C., 1985 WL 11546 (Jan. 30, 1985) in support of the selection of $1 per share as the appropriate equitable remedy in this case. *Gaffin*, Del.Ch., C.A. No. 5786–NC, slip op. at 50, Hartnett, V.C., 1990 WL 195914 (Dec. 4, 1990). In *Weinberger*, the Court of Chancery concluded that $1 per share was a fair measure of compensation to be awarded minority shareholders who were deprived of the opportunity to make an

informed decision regarding the adequacy of consideration for their shares. The court in *Weinberger* was able to rationalize its award based on the expert testimony in support of its award of $1 per share as a fair measure of compensation. In contrast, plaintiff's experts in the present case were unable to render an opinion with any specificity as to the true value of the shares as of the date of repurchase. Rather, plaintiff's expert, Dr. Peter Linneman, appraised the value of a Teledyne share as of the date of repurchase as somewhere between $70 and $100 per share. We agree with the Vice Chancellor's conclusion that plaintiff's proof failed to support the level of damages sought. *Id.* at 45–47. Nevertheless, nothing contained in this opinion shall be construed as a holding by this Court that there is a supportable basis for the $1 per share award. Since Teledyne has not cross-appealed the damage award, however, the award of $1 per share on plaintiff Gaffin's individual claim is affirmed.

Finally, given the facts of this case, we find no merit to plaintiff's contention that the court abused its discretion by failing to award prejudgment interest. *See Shell Petroleum, Inc. v. Smith,* Del.Supr., 606 A.2d 112, 117 (1992); *Rollins Environmental Services, Inc. v. WSMW Industries, Inc.,* Del.Super., 426 A.2d 1363, 1366 (1980) (allowance of prejudgment interest in cases falling within equity jurisdiction is within the discretion of the Court of Chancery, citing *Hayward v. Green,* Del.Supr., 88 A.2d 806 (1952)); *Haas v. Haas,* Del.Ch., 124 A.2d 7, 11 (1956) ("In the absence of contract or other special situation, interest in equity is generally not allowed until judgment is entered.").

## CONCLUSION

For the reasons stated above, the decisions of the Court of Chancery in refusing to decertify the class and in awarding damages on a class-wide basis are REVERSED. The award of $1 per share on the individual claim of plaintiff Gaffin is AFFIRMED.