**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| OPTICAL AIR DATA SYSTEMS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No.: N17C-05-619 EMD CCLD |
| v. | ) | |
| | ) | |
| L-3 COMMUNICATIONS | ) | |
| CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |


**MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART L-3'S MOTION FOR SUMMARY JUDGMENT**

## I.   BACKGROUND

Plaintiff and Counterclaim Defendant Optical Air Data Systems, LLC ("OADS")[1] is a technology-based small business that designs, engineers, and manufactures Light Detection and Ranging ("LIDAR") technology. Defendants and Counterclaim Plaintiffs' L-3 Communications Corporation, Display Systems Division, and L-3 Communications Avionics Systems, Inc. (collectively "L-3") wanted to purchase rights to OADS' technology. OADS and L-3 Parties engaged in due diligence. Subsequently, on March 31, 2016, L-3 and OADS entered into the Agreements (as defined below). L-3 and OADS disagreed about whether another contract (the "Gulfstream Agreement")[2] between OADS and Gulfstream Aerospace Corporation ("Gulfstream"), and an impact, if any, on the Agreements. After some discussions with OADS, L-3 sent a letter to OADS, terminating the Agreements due, in part, to the Gulfstream Agreement.

---

[1] The Court has been defining Optical Air Data Systems, LLC as "Optical Air;" however, the parties have defined Optical Air as "OADS." The Court will, going forward, use OADS when referring to Optical Air Data Systems, LLC.

[2] Def. Ex. 4.

### a. PROCEDURAL BACKGROUND

On May 26, 2017, OADS initiated this civil action by filing a complaint against L-3.  On March 13, 2018, OADS filed the First Amended Complaint (the "Amended Complaint").  In the Amended Complaint, OADS asserts causes of action (the "Counts") for: (i) breach of License Agreement—wrongfully terminated the agreement (Count 1"); (ii) breach of License Agreement—denying OADS of cure period ("Count 2"); (iii) breach of Services Agreement—failure to make payments ('Count 3"); (iv) breach of Services Agreement—wrongfully sent termination letter ("Count 4"); (v) fraud in the inducement and misrepresentation ("Count 5"); (vi) breach of the implied covenant of good faith and fair dealing ("Count 6"); (vii) breach of License Agreement—filing of cancellation notice to PTO ("Count 7"); (viii) intentional interference with prospective business opportunities—Gulfstream ("Count 8"); (ix) intentional interference with prospective business opportunities—Airbus and Airbus Helicopter (Count 9"); (x) conspiracy ("Count 10"); and (xi) defamation ("Count 11").  After briefing and argument on a motion to dismiss filed by L-3, the Court dismissed Counts 8 and 9.

On July 6, 2016, L-3 filed is answer to the Amended Complaint and asserted six counterclaims (the "Counterclaims").  The Counterclaims are (i) Declaratory Relief Pursuant to Superior Court Rule 13 ("Counterclaim 1"); (ii) Unjust Enrichment ("Counterclaim 2"); (iii) Restatement (Second) of Torts § 552 ("Counterclaim 3"); Breach of Contract—Recessionary Damages ("Counterclaim 4"); Breach of Contract—Benefit of the Bargain Damages ("Counterclaim 5"); and Breach of the Implied Covenant of Good Faith and Fair Dealing ("Counterclaim 6").  Counterclaim 1 seeks a declaration that the Agreements are not valid, binding contracts due to OADS's alleged fraud in the inducement.  L-3 has plead Counterclaims

4, 5 and 6 in the alternative if the Court does not find that the Agreements were rescinded and/or are void.

On October 12, 2018, L-3 filed L-3's Motion for Summary Judgment. In addition, L-3 filed its Opening Brief in Support of its Motion for Summary Judgment (collectively with the motion, the "L-3 Motion"). The L-3 Motion seeks judgment in favor of L-3 on all of the Counts and the Counterclaims. OADS filed its Optical Air Data Systems, LLC's Answering Brief in Opposition of L-3's Motion for Summary Judgment (Volumes 1 and 2) (the "Opposition") and the Affidavit of Philip Rogers on November 12, 2018. On November 21, 2018, L-3 filed L-3's Reply Brief in Support of its Motion for Summary Judgment (the "Reply"). The Court held oral arguments on the L-3 Motion, the Opposition and the Reply at a hearing held on December 17, 2018 (the "Hearing").

At the conclusion of the Hearing, the Court took the L-3 Motion under advisement. The Court also informed the parties of some preliminary assessments as to the strengths of some of the Counts and Counterclaims. Because the trial date for this civil action begins on January 28, 2019, the Court told the parties that a decision on the Motion may not be rendered prior to trial.

On October 15, 2018, OADS filed Optical Air Data Systems, LLC's Opening Brief in Support of its Motion for Summary Judgment (the "OADS Motion"). OADS moved for summary judgment on Counterclaim 3, arguing that the Court lacks subject matter jurisdiction over a negligent misrepresentation claim. On November 15, 2018, L-3 filed L-3's Answering Brief in Opposition to Optical Air Data Systems, LLC's Motion for Summary Judgment. On November 21, 2018, OADS filed Optical Air Data Systems, LLC's Reply Brief in Support of its Motion for Summary Judgment. The Court heard oral argument on the OADS Motion at the Hearing. After the Hearing, the Court took the OADS Motion under advisement. On January

3

14, 2019, the Court entered judgment against L-3 on Counterclaim 3 but stayed the judgment to allow L-3 to transfer Counterclaim L-3 to the Delaware Court of Chancery.

In order to assist the parties in trial preparation, the Court advised counsel in a telephone conference held on January 18, 2019 that it had arrived at a preliminary decision on the L-3 Motion. The Court provided the preliminary decision in order to assist the parties in trial preparation. For the reasons set out on January 18, 2019 telephone conference and set forth below, the Court will (i) enter judgment in favor of L-3 on Courts 5 and 6, (ii) narrow Counts 10 and 11 to communications with one non-party entity; and (iii) find that genuine issues as to material facts exist with respect to all remaining Counts and Counterclaims. Accordingly, the Court will **GRANT** in part and **DENY** in part the L-3 Motion.

b. GENERAL FACTUAL BACKGROUND

On August 2, 2013, Gulfstream and OADS entered into the Gulfstream Agreement. The Preamble to the Gulfstream Agreement provides:

> WHEREAS, Gulfstream desires to establish a business agreement with OADS for the design and development of Optical Air Data System or as "Product(s)" and as further defined in Section 2; to the extent the Product(s) consist of various components, components may be referred to as Product(s) as the context so requires….[3]

Section 1.1 of the Gulfstream Agreement further addresses its purpose, stating that "Gulfstream and OADS entered into this Agreement which contemplates the evaluation of a new system for potential use in an Aircraft."[4]

Section 14.0 of the Gulfstream Agreement sets out the various intellectual property rights of the parties, and Section 14.2 specifically relates to intellectual property ownership.[5] Under the

---

[3] Gulfstream Agreement at 1.
[4] *Id.* at Sec. 1.1.
[5] *Id.* at Secs. 14.0 and 14.2.

4

Gulfstream Agreement, OADS granted a non-exclusive, royalty-free, and worldwide license to Gulfstream for some of its LIDAR intellectual property. [6]

Then, on December 23, 2013, UTC Aerospace Systems Company ("UTAS") and OADS entered into an agreement (the "UTAS Agreement").[7]  According to OADS, the UTAS Agreement is a paid due diligence contract, allowing UTAS to test an OADS prototype unit.  The UTAS Agreement provides, as background, that UTAS and OADS want to evaluate a long-term venture, OADS requires additional funding for air data sensor systems technology, and UTAS is interested in investing in such technology.[8]  The UTAS Agreement does not grant either party licenses in the other party's existing technology;[9] however, any technology developed under the UTAS Agreement would be jointly owned by OADS and UTAS.[10]  Through the UTAS Agreement, UTAS was to provide up to $3,000,000 in funding and would receive royalties.[11]

Finally, on March 31, 2016, OADS and L-3 entered into three agreements: a General Terms of Agreement (the "GTA"); an Engineering Services Agreement (the "Services Agreement"); and a product Development and Licensing Agreement (the "Licensing Agreement") (collectively the "Agreements").[12]

---

[6] *Id*. at Sec. 14.3.2.  Section 14.3.2 provides:
> [OADS] Program License.  [OADS] hereby grants Gulfstream a non-exclusive, worldwide, royalty free license to use [OADS] Program IP, and [OADS] Background IP that is incorporated into Products, during the Program Duration for the Program Purposes.  "Program Purposes" means the testing and evaluation of the Product, including their performance, features and functionally, as installed within the Gulfstream Aircraft, for purposes of determining whether to enter a commercial relationship with [OADS] for the purchase of the Products.

[7] Def. Ex. 2.
[8] UTAS Agreement at 1.
[9] *Id*. at Sec. 6.1.
[10] *Id*. at Sec. 6.2.1.
[11] *Id*. at Sec. 2.1 and 4.0.
[12] Countercl. ¶ 13; *see also* Countercl., Ex. 1 (the GTA); Countercl., Ex. 2 (the Services Agreement); Countercl., Ex. 3 (the Licensing Agreement).

Under the Agreements, OADS granted to L-3 a worldwide, perpetual, irrevocable, transferable, and exclusive license to much of OADS's intellectual property related to LIDAR.[13] OADS, however, did reserve some rights to the LIDAR intellectual property. Section 2.1.2 of the License Agreement provides, in part, that:

> Without prejudice to the non-complete terms of this Agreement, [OADS] specifically and expressly reserves to itself the right to make, have made, import, and use Licensed Technology for research and development, test and evaluation, and prototyping of the Licensed Technology and any Modifications, subject to [L-3's] rights in Section 2.2.1. Title to all Licensed Technology shall remain with [OADS].[14]

L-3 conducted due diligence prior to signing any agreements. On November 12, 2016, L-3 filed a "Notice of Exclusive License Agreement" with the U.S. Patent and Trademark Office ("USPTO").

On November 21, 2016, L-3 advised OADS that the License Agreement and Services Agreement were rescinded and terminated based upon section 23.2 of the License Agreement.[15] The letter also accused OADS of "material breaches and material misrepresentations."[16] OADS and L-3 agree that the November 21, 2016 letter rescinded the Licensing Agreement.[17] On February 13, 2017, L-3 filed a "Notice of Cancellation and Release Regarding Exclusive License Agreement" with the USPTO.

---

[13] *Id*. at Sec. 2.1.1.
[14] *Id*. at Sec. 2.1.2.
[15] Compl. ¶ 27; *see also* Countercl., Ex. 3 at 23.2:

> If either Party is in material breach of its obligations or warranties hereunder or has made any material misrepresentation in anticipation of this Agreement, and the other Party provides written notice to the breaching Party specifying the nature of such breach or misrepresentation, the breaching Party shall cure such breach within sixty (60) days after such written notice. If the breaching Party does not cure within the sixty (60) day period specified in this Section, the other Party may, at its discretion, (a) terminate this Agreement; and/or (b) terminate the licenses granted to the breaching Party under this Agreement by giving written notice of termination to the breaching Party. Debarment of a Party by the Government of the United States of America shall be considered a breach of this Agreement.

[16] *Id.*
[17] *See* Compl. ¶ 27; Countercl. ¶ 27.

## II.     STANDARD OF REVIEW

The standard of review on a motion for summary judgment is well-settled.  The Court's principal function when considering a motion for summary judgment is to examine the record to determine whether genuine issues of material fact exist, "but not to decide such issues."[18] Summary judgment will be granted if, after viewing the record in a light most favorable to a nonmoving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[19]  If, however, the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record, then summary judgment will not be granted.[20]  The moving party bears the initial burden of demonstrating that the undisputed facts support his claims or defenses.[21]  If the motion is properly supported, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact for the resolution by the ultimate fact-finder.[22]

Where the parties have filed cross motions for summary judgment and have not argued that there are genuine issues of material fact, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[23]  Neither party's motion will be granted unless no genuine issue of material fact exists and one of the parties is entitled to judgment as a matter of law.[24]

---

[18] *Merrill v. Crothall-American Inc.*, 606 A.2d 96, 99-100 (Del. 1992) (internal citations omitted); *Oliver B. Cannon& Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322, 325 (Del. Super. 1973).

[19] *Id.*

[20] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962); *see also Cook v. City of Harrington*, 1990 WL 35244 at *3 (Del. Super. Feb. 22, 1990) (citing *Ebersole*, 180 A.2d at 467) ("Summary judgment will not be granted under any circumstances when the record indicates . . . that it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").

[21] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1970) (citing *Ebersole*, 180 A.2d at 470).

[22] *See Brzoska v. Olsen*, 668 A.2d 1355, 1364 (Del. 1995).

[23] Super. Ct. Civ. R. 56(h).

[24] *E.I. DuPont de Nemours and Co. v. Medtronic Vascular, Inc.*, 2013 WL 261415, at *10 (Del. Super. Jan. 18, 2013).

7

### III. DISCUSSION

#### a. Breach of Contract Claims and Counterclaims

Under Delaware law, to prove a breach of contract claim, the plaintiff must show: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages.[25] A party harmed by a breach of contract is entitled to compensation that will place that party in the same position that the party would have been in if the other party had performed under the contract.[26]

In the Complaint, OADS alleges: (i) L-3 breached the License Agreement because L-3 prematurely sent OADS a termination letter; (ii) L-3 breached the License Agreement because L-3 did not allow OADS a cure period; (iii) L-3 breached the Services Agreement by accepting work product without paying for the work product; (iv) L-3 breached the Services Agreement by prematurely sending the termination letter; and (v) L-3 breached the License Agreement by publishing an assignment and cancellation notice with the USPTO without the prior written consent of OADS. L-3 asks for summary judgment on these claims—Counts 1, 2, 3, 4 and 7.

L-3 claims that OADS breached representations and warranties in the agreements which stated that L-3 had an exclusive and unencumbered right to LIDAR technology. L-3 breached the agreements because it had previously granted Gulfstream and UTAS similar licenses. In response, OADS argues that it did not breach the Agreements because Section 2.1.2 of the License Agreement permits OADS to do the type of research and development with the licensed intellectual property that it was doing with UTAS and Gulfstream. In addition, OADS alleges

---

[25] *Interim Healthcare v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. 2005).
[26] *See E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 446 (Del. 1996).

that it did not breach the Agreements because L-3 did not give OADS an opportunity to cure any alleged breaches.[27]

"Courts in our State [Delaware] and beyond have recognized that contractual notice and cure provisions cannot be ignored no matter how urgently parties may seek to do so when prosecuting breach claims in litigation."[28] In *Cornell Glasgow, LLC v. LaGrange Properties, LLC*,[29] the Court found that the parties were subject to an unambiguous notice and cure provision and so the parties' failure to comply with the notice and cure provisions extinguished their breach of contract claims. But, the Court found that the Court will excuse parties' failure to comply with notice and cure provisions where complying with the notice and cure provisions would be futile. The Court cited *In re Best Payphones, Inc.*[30] in establishing a two-part test for determining whether a notice and cure provision was futile: (i) where "the defaulting party expressly and unequivocally repudiates the contract," or (ii) "where the actions of the defaulting party have rendered future performance of the contract by the nondefaulting party impractical or impossible."[31]

Neither party disputes that the notice and cure provisions in the agreements are unambiguous. L-3 argues that providing an opportunity for OADS to cure its breach would have been futile. Specifically, L-3 argues that OADS failed to pay a creditor for more than 90 days

---

[27] OADS alleges L-3 knew about the alleged breaches before signing the agreement. But, L-3 retorts that it does not matter whether L-3 knew about the breach because a party has a right to rely on the truth of the representations and warranties in a contract. *See Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347 *77-81 (Del. Ch. Oct. 1, 2018).

Also, the parties argue about whether a clause making the failure to pay a creditor for more than 90 days after a breach of contract is valid and enforceable. L-3 finds that the clause is enforceable. *See, e.g., Salamone v. Gorman*, 106 A.3d 354, 370 (Del. 2014) ("when parties have ordered their affairs through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract.").

[28] *Cornell Glasgow, LLC v. LaGrange Properties, LLC*, 2012 WL 6840625, at *13 (Del. Super. Dec. 7, 2012).

[29] *Id.*

[30] *Best Payphones, Inc. v. Manhattan Telec. Corp. (In re Best Payphones, Inc.),* 432 B.R. 46 (S.D.N.Y.2010).

[31] *Id.*

and so triggered the default provision of in the UTAS/OADS agreement. This default provision grants UTAS an exclusive license to some of the LIDAR technology. So, L-3 claims that OADS could not cure its defects because it had granted two parties exclusive licenses. Similarly, L-3 argues that OADS could not cure the breach caused by its grant of rights to Gulfstream because OADS could not unilaterally terminate Gulfstream's rights.

As was developed at the Hearing, the Court believes that questions of fact remain as to whether, given Section 2.1.2 of the Licensing Agreement, the Gulfstream Agreement—by its terms and use—violated Section 2.1.1 of the Licensing Agreement.  Moreover, the Opposition provides a factual basis that OADS may have been able to cure defaults, if any, that related to the UTAS Agreement.

Given this, the Court will not grant summary judgment on claims and counterclaims that relate to the Agreements—Counts 1, 2, 3, 4 and 7 or Counterclaims 2, 4, 5 and 6.

Through Counterclaim 1, L-3 argues that it is entitled to a declaration that the Agreements are void because of OADS' fraud in the inducement. To plead a claim of fraud, L-3 must show (i) a false representation, usually one of fact . . .; (ii) OADS's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (iii) an intent to induce L-3 to act or to refrain from acting; (iv) L-3's action or inaction was taken in justifiable reliance upon the representation; and (v) damage to L-3 as a result of such reliance.[32]

The Court finds that there are genuine questions of material fact as to whether OADS fraudulently induced L-3 to enter into the agreements. Specifically, there are questions of fact as to whether OADS knew that its representations in the Agreements were false or whether OADS genuinely believed that OADS' agreements with L-3 did not conflict with the agreements with

---

[32] *Hauspie v. Stonington Partners, Inc.*, 945 A.2d 584, 586 (Del. 2008) (quoting *Gaffin v. Teledyne, Inc.,* 611 A.2d 467, 472 (Del.1992)).

Gulfstream and UTAS because the agreements with Gulfstream and UTAS were for research and development. In essence, the resolution of the contract claims between L-3 and OADS will resolve whether L-3 has a valid fraudulent inducement claim that voids the Agreements. As such, the Court will deny summary judgment on this counterclaim.

    **b.  THE COURT WILL GRANT SUMMARY JUDGMENT ON COUNTS 5 AND 6.**

L-3 spends some time setting out the legal and factual arguments as to why L-3 is entitled to summary judgment on Counts 5 and 6. In the Opposition, OADS makes a conclusory argument that L-3 terminated the agreements early because of fraudulent inducement and that L-3 breached the implied covenant of good faith and fair dealing. OADS argues that, as a result of this fraud and breach of the implied covenant, the Court should deny summary judgment on L-3's breach of contract claims. Most of OADS's factual basis for its arguments are contained in the footnotes and exhibits. As discussed at the January 18, 2019 telephone conference, the Court believes that there is no genuine issue as to material facts and L-3 is entitled to judgment as a matter of law on Counts 5 and 6.

    *1. Count 5—Fraudulent Inducement*

The following elements must be pleaded to state a claim for fraud: (i) a false representation, usually of fact, made by the defendant; (ii) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (iii) an intent to induce the plaintiff to act or to refrain from acting; (iv) the plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (v) damage to the plaintiff as a result of such reliance.[33]

---

[33] *Desert Equities*, *Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993).

Delaware courts have consistently held that to successfully plead a fraud claim, the allegedly defrauded plaintiff must have sustained damages as a result of a defendant's action.[34] The damages allegations, however, may not simply rehash the damages allegedly caused by breach of contract.[35] Moreover, plaintiff cannot "bootstrap a claim of breach of contract into a claim for fraud by alleging that a contracting party never intended to perform its obligations."[36] In other words, plaintiffs cannot adequately state a fraud claim merely by adding the term "fraudulently induced" to a claim for breach of contract.[37]

A plaintiff cannot rely on a misrepresentation made after the parties executed an agreement for a fraudulent inducement claim. Fraudulent statements made after the execution of an agreement "relate to the performance of the contract, not the inducement of the contractual relationship.[38] Statements made after the formation of the contract "are better addressed by applicable contract law."[39] In fact, this Court has stated "[a] claim for fraudulent inducement accrues when the fraudulent statements were made, which must be on or before the date when the parties entered into the contract."[40]

During the January 18, 2019 telephone conference, the Court pointed out that the representations relied upon by OADS were—except for one—representations made after L-3 and OADS entered into the Agreement. OADS also claims that L-3 acted fraudulently because L-3 failed to renegotiate or "work out" its problems with OADS. First, this does not state a claim for

---

[34] *Novipax Holdings LLC v. Sealed Air Corp.*, 2017 WL 5713307, at *14 (Del. Super. Nov. 28, 2017) (citing *ITW Glob. Invest. Inc.,* 2015 WL 3970908, at *5 (Del. Super. June 24, 2015)).
[35] *Id.*
[36] *Novipax Hldg.*, 2017 WL 5713307, at *14 (quoting *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *15 (Del. Ch. Dec. 22, 2010)).
[37] *Novipax Hldg.*, 2017 WL 5713307, at *14.
[38] *Abbot Labs. v. Owens*, 2014 WL 8407613, at *8-9 (Del. Super. Sept. 15, 2014).
[39] *Brasby v. Morris*, 2007 WL 949485, at *7-8 (Del. Super. Mar. 29, 2007).
[40] *Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, 2015 WL 11120934, at *4 (Del. Super. Dec. 29, 2015).

fraud. Second, these are statements happening after the formation of the Agreements, so a claim for fraudulent inducement is not available.

### 2. Count 6—Breach of Implied Covenant of Good Faith and Fair Dealing

Every contract contains an implied covenant of good faith and fair dealing. The implied covenant requires "'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain."[41] The implied covenant allows a court to infer contractual obligations "that neither party anticipated."[42] A plaintiff must allege three elements to state a claim for breach of the implied covenant: 1) "a specific obligation implied in the contract, [2] a breach of that obligation, and [3] resulting damages."[43]

Courts will not infer that an obligation exists, which "contradicts a clear exercise of an express contractual right."[44] Express contractual language is more persuasive than a party's actions implementing a contract.[45] Courts will infer an obligation "when the express terms of the contract indicate that the parties would have agreed to the obligation had they negotiated the issue, [so] the plaintiff must advance provisions of the agreement that support this finding in order to allege sufficiently a specific implied contractual obligation."[46]

Here, OADS argues that L-3 breached the implied covenant of good faith and fair dealing because L-3 did not attempt to renegotiate the Agreements after (1) L-3 concluded that OADS

---

[41] *Dunlap v. State Farm Fire & Cas. Co*., 878 A.2d 434, 442 (Del.2005) (quoting *Wilgus v. Salt Pond Inv. Co*., 498 A.2d 151, 159 (Del. Ch.1985)).
[42] *CMS Inv. Holdings, LLC v. Castle*, No. CV 9468-VCP, 2015 WL 3894021, at *15 (Del. Ch. June 23, 2015).
[43] *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *3 (Del. Ch. Jan. 30, 2015).
[44] *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010).
[45] *Id*. at 1126.
[46] *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del.Ch. Nov. 10, 1998) (footnote omitted).

had breached the Agreement and (2) L-3 executives determined that the Agreements were preventing them from receiving management incentive bonuses.

As challenged at the Hearing, OADS does not point to any specific language in the agreements which suggests that the parties intended to renegotiate the agreements if one party breached the agreements. So, there is no evidence that OADS or L-3 intended to impose an obligation to renegotiate on the other party and OADS argument that L-3 breached the implied covenant of good faith and fair dealing fails. OADS' argument that L-3 executives terminated the Agreements in order to earn larger bonuses is a breach of contract claim rather than a breach of an implied obligation. So, OADS' arguments of a breach of the covenant of good faith and fair dealing fails.

   c. **THE COURT WILL NOT GRANT SUMMARY JUDGMENT ON COUNTS 10 AND 11—CONSPIRACY AND DEFAMATION.**

Defamation consists of the "twin torts" of libel (written defamation) and slander (spoken defamation).[47] "Defamation is generally understood as 'a false publication calculated to bring one into disrepute.'"[48] "In general, the scope of liability for slander is not as great as that for libel, and the pleading requirements for slander are more strict."[49] To state a claim for defamation, a plaintiff must plead: (1) a defamatory communication; (2) publication; (3) reference to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury.[50] Usually, a plaintiff must plead special damages to bring a claim for oral defamation. But, if a plaintiff brings a claim for slander per se, special damages are not

---

[47] *Read v. Carpenter,* 1995 WL 945544, at *2 (Del. Super. June 8, 1995).
[48] *Naples v. New Castle County*, 2015 WL 1478206, at *12 (Del. Super. Mar. 30, 2015), aff'd, 127 A.3d 399 (Del. 2015) (quoting *Read*, 1995 WL 945544, at *2).
[49] *Spence v. Funk,* 396 A.2d 967, 970 (1978).
[50] *See Read*, 1995 WL 945544, at *2.

14

required.[51] The four types of slander per se are:1) malign one in a trade, business or profession; 2) impute a crime; 3) imply one has a loathsome disease; or 4) impute unchastity to a woman.[52]

A publisher is not liable for defamation when the publisher's statements are substantially true.[53] The Court must consider whether the "gist" or "sting" of the statement is true in order to determine whether it is substantially true.[54] A statement is substantially true if an average reader would consider the precise truth to have the effect as the statement made by the defendant.[55]

In the Amended Complaint, OADS claims that the following are defamatory:

1. Statements in a phone call between a representative from OADS and the CEO of L-3;

2. A representative of OADS, Mr. Hurley's statements to others about OADS' intellectual property;

3. L-3's statement to Gulfstream that "OADS IP rights were generally clouded;"

4. L-3's statement to Airbus that there was a "cloud on OADS's intellectual property portfolio;"

5. The fact that L-3 did not mention the "use field" and the circumstance under which L-3 could terminate its license; and

6. An email with a magazine article which quotes Phil Rogers, the CEO of OADS.

First, L-3 claims that OADS cannot prove that OADS made defamatory statements. L-3 disputes that many of these statements were ever made. But, a reasonable person could find these claims were made and that they are defamatory because they are untrue. Specifically, a reasonable person could find that OADS had merely granted research and development

---

[51] *Id.*.
[52] *Id.*
[53] *Gannett Co. v. Re*, 496 A.2d 553, 557 (Del. 1985) ("("If the alleged libel was no more damaging to the plaintiff's reputation in the mind of the average reader than a truthful statement would have been, then the statement is substantially true.").
[54] *Id.*
[55] *Ramada Inns, Inc. v. Dow Jones & Co.,* 543 A.2d 313, 318 (Del. Super. 1988).

agreements to Gulfstream and UTAS and so had not granted conflicting IP rights to different parties. So, there is a genuine issue as to a material fact.

L-3 also claims that OADS did not suffer damages, because Gulfstream would have terminated its agreement with OADS even if there were no cloud over OADS' intellectual property. Specifically, L-3 proffers testimony from Gulfstream that OADS' technology did not work well with its products and so was no longer useful. Also, L-3 argues that the fact that OADS was able to form new agreements with customers such as Boeing after L-3's alleged statements suggests that L-3's comments were not damaging.

Despite an opportunity for discovery, the Opposition does not provide much factual detail regarding OADS Defamation Count. At the Hearing, the Court narrowed the purported defamatory statements to those statements made to the CEO of Gulfstream's parent, General Dynamics. As stated on the January 18, 2019 telephone conference, the Court will allow OADS to proceed on Count 11 but only as to statements made to the CEO of Gulfstream's parent, General Dynamics. The Court needs to state, however, that defamation claims are fact intensive and OADS needs to substantially develop the record in order to prevail.

"Civil conspiracy is the combination of two or more persons or entities for an unlawful purpose or for the accomplishment of a lawful purpose by unlawful means, resulting in damages."[56] To plead a claim of civil conspiracy, a plaintiff must show: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds between or among such persons relating to the object or a course of action; (4) one or more unlawful acts; and (5) damages as a proximate result thereof."[57] To plead a conspiracy, the plaintiff must plead the

---

[56] *Connolly v. Labowitz*, 519 A.2d 138, 143 (Del. Super. 1986).

[57] *See also Metropolitan Life Ins. Co. v. Tremont Grp. Hldgs., Inc.*, 2012 WL 6632681 at *19 (Del. Ch. Dec. 20, 2012) (stating that plaintiff must show ""(1) two or more persons; (2) an object to be accomplished; (3) a meeting of

object of the conspiracy, as well as when each conspirator joined the conspiracy.[58] The plaintiff must plead the underlying wrong. Civil conspiracy is not an independent cause of action in Delaware and "must arise from some underlying wrong."[59]

"Judgment pursuant to Rule 56 is seldom allowed in conspiracy cases, however, because the existence of a conspiracy is usually an issue of fact as well as a question of law." This is because "[c]onspiratorial agreements are rarely made out in the open, and proof of conscious complicity may depend upon the careful marshalling of circumstantial evidence and the opportunity to cross-examine hostile witnesses."[60]

L-3 notes that the conspiracy claim is to be read in conjunction with the defamation claim. In the Amended Complaint, OADS alleges that Mr. Hurley and Mr. Ray, who are former airline executives and are now part of a non-profit organization called the Conquistadors del Cielo, conspired with L-3 to harm OADS. OADS hired Mr. Hurley and Mr. Ray to find buyers or licensees for LIDAR. Now, OADS alleges that Mr. Hurley and Mr. Ray passed on defamatory information about OADS to executives at General Dynamics, Gulfstream's parent company, and to employees at L-3. The L-3 employees then communicated to Airbus and OADS' customers and prospective customers that OADS had a "cloud" over its intellectual property. OADS also alleges that L-3 conspired to file an overly broad and fraudulent assignment of license with the USPTO right before terminating the License Agreement. As a result of these defamatory statements, OADS alleges that Gulfstream discontinued its work with OADS and OADS lost other contracts.

---

the minds between or among such persons relating to the object or a course of action; (4) one or more unlawful acts; and (5) damages as a proximate result thereof.").

[58] *See Metropolitan Life Ins. Co. v. Tremont Grp. Hldgs., Inc.*, 2012 WL 6632681 at *19 (Del. Ch. Dec. 20, 2012).

[59] *Rogers v. Bushey*, 2018 WL 818374 at *7 (Del. Super. Feb. 7, 2018).

[60] *Id.*

In L-3's Motion, L-3 alleges that it did not engage in a conspiracy because Mr. Ray testified that he did not ask L-3 to do anything to hurt OADS. In addition, Mr. Ray received a five percent commission from OADS for finding new licensees so hurting OADS would not have been in his best interest. Finally, L-3 alleges that the conspiracy claim fails because the underlying defamation claim fails.

A reasonable person could find that 1) Mr. Hurley, Mr. Ray and L-3 2) conspired to harm OADS, 3) the conspirators had a meeting of the minds to act in concert, 4) to defame OADS, and 5) OADS suffered damages as a result of the defamation. As with the Defamation Count, OADS will need to present much more evidence at trial to prove conspiracy.

**D.** **OTHER COUNTERCLAIMS**

## IV. CONCLUSION

For the reasons set forth above, the Court will **GRANT** in part and **DENY** in part the L-3 Motion.[61]

      **IT IS SO ORDERED**.

January 23, 2019
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc: File&ServeXpress

---

[61] Given the time constraints between the Hearing and the issuance of this Memorandum Opinion, the Court concedes that some matters contained herein are unclear. To the extent anything in this Memorandum Opinion is unclear, the Court will address what seems unclear with the parties on the first day of the trial.