# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| In the Matter of THE JEREMY | ) | |
| PARADISE DYNASTY TRUST and | ) | C.A. No. 2021-0354-KSJM |
| THE ANDREW PARADISE DYNASTY | ) | |
| TRUST | ) | |

## MEMORANDUM OPINION

Date Submitted: November 16, 2021
Date Decided: November 29, 2021

Luke W. Mette, Jonathan M. Stemerman, ARMSTRONG TEASDALE LLP, Wilmington, Delaware; John A. Sten, Jason C. Moreau, Allison McFarland, ARMSTRONG TEASDALE LLP, Boston, Massachusetts; *Counsel for Petitioner Jeremy Paradise*.

Henry E. Gallagher, Jr., Gregory J. Weinig, Shaun M. Kelly, Jarrett W. Horowitz, CONNOLLY GALLAGHER LLP, Wilmington, Delaware; Lazar P. Raynal, Michael A. Lombardo, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Chicago, Illinois; *Counsel for Respondents Charlotte Edelman, Casey Chafkin, and John Pomerance*.

**McCORMICK, C.**

In 2012, brothers Jeremy and Andrew Paradise created a company to monetize skill-based video games. The brothers created two trusts to hold stock in the company. Although early drafts of those trust agreements provided that Jeremy would have the power to remove the trustees of one of the trusts, the final agreements provided that Andrew would hold such power over both trusts. Jeremy filed a petition in this court seeking reformation of the trust agreements, an accounting of the trusts, and an order removing the trusts' fiduciaries from their positions. The respondent fiduciaries moved to dismiss the petition on a variety of grounds. This decision denies the motion as to the reformation claims and grants the motion as to the other claims.

## I. FACTUAL BACKGROUND

The facts are drawn from the Verified Petition to Reform Trust and Remove Invalid Fiduciaries (the "Petition") and documents it incorporates by reference.[1]

### A. The Paradise Brothers Establish Two Trusts To Hold Skillz Stock.

Petitioner Jeremy Paradise conceived a company that would monetize skill-based video games. His brother, Andrew Paradise, founded a mobile gaming platform based on this concept called Skillz, Inc. ("Skillz" or the "Company"). When the Company was formed in 2012, Jeremy received 5% of its equity.[2]

In 2018, Andrew facilitated the sale of a portion of Jeremy's Skillz stock to secure liquidity for Jeremy. Around that time, Andrew suggested that Jeremy place his remaining

---

[1] *See* C.A. No. 2021-0354-KSJM, Docket ("Dkt.") 1 ("Pet.").

[2] For clarity, this decision sometimes refers to members of the Paradise family by their first names. The court intends no disrespect.

Skillz shares in a trust. Jeremy agreed on the condition that he would retain control over investments made by the trust.

Before talking to an estate planning attorney, on December 12, 2018, Andrew sent Jeremy the following email describing the key aspects of the transaction's structure:

> Hi Jeremy,
>
> Just capturing our conversation before we ask for an estate attorney to paper this. The trust key terms would be:
>
> * move your Skillz stock into a trust whose beneficiary is your unborn son
> * make you the lead trustee & me the other trustee in charge of managing it
> * execute a sale of $2M worth of stock in the next 90 days, $1.6M for the home at address TBD to be managed by the trustees, $400k for discretionary purposes to be managed by the lead trustee upon agreed upon categories
> * future sales of stock proceeds to be managed 50% by the lead trustee solely upon agreed upon categories and 50% to by the trustees
>
> We can ask the lawyer what is normal for discretionary categories but open to your thoughts on this.
>
> Hope this is correct but please let me know before we go to paper.
>
> Love,
>
> Andrew[3]

The key terms changed after the brothers obtained legal advice. On December 13, 2018, Jeremy and Andrew reached out to John Pomerance, a family friend, confidant, and partner at the law firm Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz").

---

[3] Pet. Ex. 5.

Pomerance referred the brothers to Kurt Steinkrauss, a trusts and estates partner at Mintz. Mintz sent its legal bills to Andrew.

After Steinkrauss advised that Jeremy should not be the beneficiary of his own trust, Andrew suggested that the brothers set up two trusts. The first would hold Jeremy's Skillz stock for the benefit of their mother and Jeremy's children with Jeremy as the trustee. The second would hold an equal amount of Skillz stock for the benefit of Jeremy with Andrew as the trustee. As Jeremy understood the arrangement, Jeremy would put his Skillz stock in a trust for the benefit of their mother and Jeremy's son and an equal amount of Skillz stock would be placed in the second trust for Jeremy's benefit. These two trusts would later become The Jeremy Paradise Dynasty Trust (the "Jeremy Trust"), and The Andrew Paradise Dynasty Trust (the "Andrew Trust," and with the Jeremy Trust, the "Trusts"), respectively.

Steinkrauss recommended that Jeremy and Andrew engage a Delaware law firm to set up the Trusts. In March 2019, the brothers jointly engaged Delaware law firm Gordon Fournaris & Mammarella, P.A. ("Gordon Fournaris").

On March 6, 2019, attorney Michael Gordon of Gordon Fournaris sent Jeremy outlines of the terms for agreements governing the Trusts (the "Trust Agreements"). The outlines reflected that the Trusts would be "directed" trusts with multiple fiduciaries, including Trust Protectors, Investment Direction Advisers, and Distribution Advisers, with the power to issue binding directions to the Trustee.[4] The Trust Protectors would have the

---

[4] Pet. ¶¶ 57–60.

3

authority to remove and replace the Trustee, Distribution Advisers, and Investment Direction Advisers. Gordon's outline stated that Jeremy "c[ould not] serve as the Trust Protector" but additionally noted that Gordon "typically" provides in his trusts that the grantor have the authority to replace and remove the Trust Protector.[5] Gordon discussed the role of Trust Protector with Jeremy and Andrew during an introductory phone call.

On March 14, 2019, Gordon sent a first draft of the Trust Agreements to the brothers. In the first draft of both Trust Agreements, Article 12(h) provided that the power to remove the Trust Protector would lie first with the grantor (Jeremy) and second with the grantor's brother (Andrew).[6]

A subsequent version of the draft of the Jeremy Trust Agreement updated the language in Article 12(h) to reverse the preference, giving the power to remove the Trust Protector first to the grantor's brother (Andrew) and then to the grantor (Jeremy). A Mintz attorney circulated the updated draft and redline of the Jeremy Trust Agreement reversing the order on March 20, 2019. Gordon Fournaris was not copied on the email. Mintz made this revision without any direction from Jeremy. The relevant change was highlighted in redline, showing that the provision dealing with the removal of the Trust Protector had been changed to provide first priority to "The Grantor's Brother."[7] The March 20 draft

---

[5] Pet. Ex. 8 at 6–7.

[6] Pet. Ex. 9 § 12(h).

[7] Dkt. 9 Ex. B § 12(h) (emphasis in original). The court may consider the redline for the purpose of the motion to dismiss because it is referenced in the Petition and therefore incorporated by reference. *See Walsh v. White House Post Prods., LLC*, 2020 WL 1492543, at *3 n.5 (Del. Ch. Mar. 25, 2020) (considering an email on a motion to dismiss because the complaint incorporated the email by reference).

4

also identified Pomerance as the initial Investment Direction Adviser, Distribution Adviser, and Trust Protector.

Jeremy did not review the redline. When the March 20 draft was circulated, Jeremy was preoccupied with the impending birth of his first child. On April 2, 2019, Jeremy told Andrew that he was "sleeping 2–4 hours a night" because of the recent birth of his son, to which Andrew expressed sympathy but responded that the trusts "should be closed by [April 15]."[8] Jeremy texted Andrew, "I'm just going to trust your edits," to which Andrew replied, "fair enough, I will handle it and make sure we're good to go."[9]

On April 23, 2019, Jeremy and Andrew executed the Trust Agreements. During the 34 days between the March 20 email and the Trust Agreements' execution, neither Andrew nor Mintz discussed the change to Article 12(h) with Jeremy.

The final agreements implemented the changes sent to Jeremy in the redline provided on March 20, 2019. The Jeremy Trust Agreement provided Andrew with the authority to remove the Trust Protector, and both of the final Trust Agreements appointed Pomerance as the initial Trust Protector.

The beneficiaries of the Jeremy Trust include Karen Anthony Paradise (Jeremy and Andrew's mother), Jeremy's present and future children, Andrew's future children, and the descendants of Jeremy's and Andrew's children. The beneficiaries of the Andrew Trust

---

[8] Pet. ¶ 79.

[9] *Id.*

include Jeremy, Jeremy's present and future children, Andrew's future children, and the descendants of Jeremy's and Andrew's children.

## B.     Skillz Goes Public.

On December 16, 2020, Skillz became a publicly traded company on the New York Stock Exchange. As part of the going-public transaction, the Trusts entered into an Investors' Rights Agreement.

On January 22, 2021, Pomerance appointed Casey Chafkin and Charlotte Edelman as additional Investment Direction Advisers, Distribution Advisers, and Trust Protectors of both Trusts. At the time of their appointments, Chafkin and Edelman each held positions at Skillz. Chafkin was Chief Revenue Officer and a member of the Board of Directors and Edelman was Vice President of Legal.

In March 2021, there was a special offering of Skillz stock. The Jeremy Trust sold 169,087 shares pursuant to the special offering, yielding gross proceeds of approximately $3.9 million, representing approximately 9.26% of the Jeremy Trust's total Skillz holdings. That same day, the Andrew Trust sold 100,659 shares in the offering, yielding gross proceeds of approximately $2.3 million, representing approximately 9.26% of the Andrew Trust's total Skillz holdings. Jeremy was not informed of the offering.

The Trusts' fiduciaries also sold significant amounts of stock that they held personally. Chafkin sold approximately 10% of his Skillz holdings netting $39 million, Edelman sold approximately 18.87% of her Skillz holdings netting more than $708,000, and Pomerance sold approximately 9.22% of his Skillz holdings netting more than $764,000.

6

After the influx of Skillz shares into the market, the trading price of Skillz stock declined. Between the March 17, 2021 notice of the offering and the March 24, 2021 sales, the stock price dropped $9.38—or 31.9%.

On April 3, 2021, Jeremy requested an accounting of the Trusts' assets. He was provided an account statement for each Trust dated March 23, 2021—the day before the Trusts sold their Skillz stock—leaving Jeremy unaware of the sale.

Jeremy issued written demands for his files from Mintz and Gordon Fournaris. Gordon Fournaris provided the files. Mintz took the position that Jeremy was never its client and refused to provide the files.

## C. This Litigation

Jeremy filed the Petition on April 26, 2021. The Petition asserts five causes of action against Edelman, Chafkin, and Pomerance (collectively, "Respondents"):

- In Count I, Jeremy seeks reformation of the Jeremy Trust based on mistake.

- In Count II, Jeremy seeks reformation of the Jeremy Trust based on fraud.

- In Count III, Jeremy seeks a declaration that the appointments of Chafkin and Edelman were invalid under the Trust Agreements.

- In Count IV, Jeremy seeks to remove Pomerance as a fiduciary.

- In Count V, Jeremy seeks an accounting of the Trusts.

Respondents moved to dismiss Jeremy's claims. The motion was fully briefed on July 1, 2021,[10] and the court held oral argument on July 7, 2021.[11] On September 9, 2021,

---

[10] *See* Dkt. 44 ("Resp'ts' Opening Br."); Dkt. 56 ("Pet'r's Answering Br."); Dkt. 58.

[11] Dkt. 64.

the parties stipulated to a stay of proceedings after agreeing on settlement terms.[12] On November 15, 2021, the parties notified the court that they were unable to finalize the settlement agreement and asked the court to issue this decision resolving Respondents' motion to dismiss.[13]

### D. Two of the Fiduciaries Resign.

In response to this litigation, Edelman and Chafkin resigned as Investment Direction Advisers of the Jeremy Trust and Trust Protectors and Distribution Advisers of the Andrew Trust, effective May 19, 2021.[14]

## II. LEGAL ANALYSIS

Respondents moved to dismiss: Counts I, IV, and V pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim; Count II pursuant to Rule 9(b) for failure to plead fraud with particularity; Count III on the grounds that the resignation of Edelman and Chafkin renders it moot; and the entirety of the Petition pursuant to Rule 19(b) for failure to join an indispensable party. This analysis addresses Respondents' arguments as to each Count and then addresses Respondents' argument under Rule 19(b).

### A. Count I States a Claim for Reformation Based on Unilateral Mistake.

A unilateral mistake by the settlor is a sufficient ground for reforming a trust that was created without any consideration.[15] In Count I, Jeremy alleges that the Jeremy Trust

---

[12] Dkt. 70.

[13] Dkt. 80.

[14] Dkt. 40 Ex. 3.

[15] *In re Tr. Under Will of Flint ex rel Shadek*, 118 A.3d 182, 195 (Del. Ch. 2015) (collecting authorities); *see also* 90 C.J.S. *Trusts* § 92 (2021) (stating that "since a settlor usually

was a donative trust formed without consideration and asks the court to reform the agreement based on Jeremy's unilateral, mistaken belief that he would control the identity of the Trust Protector.

Under Rule 12(b)(6), "the governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[16] When considering a motion to dismiss under Rule 12(b)(6), the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[17] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[18]

Respondents advance two arguments for why Count I does not meet this standard. As their primary argument, Respondents contend that unilateral mistake is not a viable legal theory because Jeremy received consideration in the formation of the Jeremy Trust.[19]

---

receives no consideration for the creation of a trust, a unilateral mistake by the settlor is ordinarily sufficient to warrant reformation").

[16] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[17] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[18] *Price v. E.I. DuPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018).

[19] Resp'ts' Opening Br. at 14 ("Delaware permits a limited exception to [the rule that unilateral mistake does not provide a basis for reformation], but only '[w]here no consideration is involved in [its] creation." (alterations in original) (quoting *In re Tr. Under Will of Flint ex rel Shadek*, 118 A.3d at 195)).

As their secondary argument, Respondents contend that Jeremy failed to adequately allege his own mistaken belief.

Respondents' primary argument does not work because the Jeremy Trust is a donative trust. Jeremy was the sole signatory. The Trust Agreement states that the only consideration provided for the transaction is the "mutual promises and covenants contained in [the Trust Agreement]."[20] Based on these facts, it is reasonably conceivable that Jeremy received no consideration upon the formation of the trust.

In search of a contrary conclusion, Respondents argue that Jeremy formed the Jeremy Trust as part of a "larger arrangement" for which he received consideration.[21] They point to allegations in the Petition from which they infer that Jeremy agreed to place his Skillz stock into a trust in exchange for Andrew facilitating the 2018 sale. This larger-arrangement theory, however, would require factual findings that run contrary to the plain language of the Jeremy Trust Agreement. The court cannot make such respondent-friendly factual findings on a Rule 12(b)(6) motion. Respondents' first argument for dismissal of Count I thus fails.

Respondents' secondary argument—that Jeremy has not adequately pled his own mistaken belief—fares no better. Jeremy alleges that he believed that he would be "the lead Trustee" with the power to remove and replace the Trust Protector, explicitly stating that he would never have agreed to deprive himself of such authority.[22] He further alleges

---

[20] Pet. Ex. 1, at 1.

[21] Resp'ts' Opening Br. at 14.

[22] Pet. ¶¶ 10, 47, 61.

that he intended to maintain control of the identity of the Trust Protector and that he communicated this desire throughout the drafting process.[23] Contrary to Respondents' assertions, these allegations suffice to support a claim of mistaken belief.[24]

For these reasons, Jeremy states a valid claim for reformation based on unilateral mistake. Respondents' motion to dismiss Count I is therefore denied.

### B. Count II States a Claim for Reformation Based on Andrew's Knowing Silence.

"Where consideration is involved in the creation of a trust, the rules governing transfers for value and contracts are applicable."[25] Outside of the donative trust context, therefore, where a party seeks reformation of a trust agreement based on unilateral mistake, reformation is "appropriate only when the contract does not represent the parties' intent because of fraud, mutual mistake or, in exceptional cases, a unilateral mistake coupled with the other parties' knowing silence."[26]

As an alternative to his argument for unilateral mistake in the donative trust context, in Count II, Jeremy seeks reformation of the Jeremy Trust under the theory that Jeremy was misled into believing he would have control over the Jeremy Trust.

---

[23] *See, e.g.,* Pet. ¶¶ 148, 149.

[24] *See Chavin v. PNC Bank*, 816 A.2d 781, 783 (Del. 2003) ("The cardinal rule of law in a trust case is that the intent of the settlor controls.") (internal quotation marks omitted); *see also Cerberus Int'l., Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d, 1141, 1155 (Del. 2002) (distinguishing plaintiff with mistaken belief from plaintiff with no belief).

[25] Restatement (Third) of Trusts § 62 cmt. a (Am. Law Inst. 2003).

[26] *CC Fin. LLC v. Wireless Props., LLC*, 2012 WL 4862337, at *6 (Del. Ch. Oct. 1, 2012) (quoting *Heartland Del. Inc. v. Rehoboth Mall Ltd. P'ship*, 2012 WL 3656440, at *5 (Del. Ch. Aug. 27, 2012)).

Claims for reformation based on "knowing silence" must be pled with particularity under Rule 9(b).[27] "Under Rule 9(b), the circumstances that must be stated with particularity are the time, place, and contents of the false representation, the identity of the person(s) making the representation, and what he intended to obtain thereby."[28] In meeting this burden, "parol evidence may be used by a party to establish fraud or mistake in support of a claim for reformation."[29]

In this case, Jeremy has adequately alleged that Andrew knew of Jeremy's mistake and remained silent. Jeremy alleges that he "made clear to Andrew that Jeremy would need to have control over the investments made by his trust," an allegation bolstered by the contents of the December 12 and February 19 emails between the brothers.[30] Andrew was copied on the Mintz email that contained the version that switched the preference in Article 12(h) to give Andrew the power to remove the Trust Protector. Jeremy made Andrew aware that he did not review the March 20 draft through his April 2 text. Andrew did not

---

[27] *See Travelers Cas. & Sur. Co. v. Sequa Corp.*, 2012 WL 1931322, at *5 n.24 (Del. Ch. May 29, 2012), *overruled on other grounds by Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665 (Del. 2013); *Fitzgerald v. Cantor*, 1998 WL 781188, at *1 (Del. Ch. Oct. 28, 1998).

[28] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003) (citations omitted).

[29] *James River-Pennington Inc. v. CRSS Cap., Inc.*, 1995 WL 106554, at *8 (Del. Ch. Mar. 6, 1995) (citing 13 *Williston on Contracts* § 1552, at 213–14 (3d ed. 1970) ("[S]ince justice requires the substitution of another in its place, equity gives relief, where reformation is appropriate, and to that end, generally and necessarily admits any relevant parol or other extrinsic evidence.")).

[30] Pet. ¶¶ 46–48.

inform Jeremy of this change throughout their communications over the 34 days before the Trust Agreements were executed. These particularized allegations support an inference that Andrew was aware of the change to Article 12(h), knew of Jeremy's ignorance as to the change, and knowingly remained silent. Jeremy's knowing-silence theory is therefore well pled.[31]

Jeremy has adequately alleged a claim for reformation based on Andrew's fraudulent acts in any event. Respondents argue that a fraud-based reformation claim requires particularly alleged "facts demonstrating the existence of an antecedent agreement inconsistent with the final written agreement," and that Jeremy failed to allege the existence of such an agreement.[32] If an antecedent agreement is required, the Petition alleges the

---

[31] Respondents contend that Jeremy waived any knowing-silence theory by failing to assert such a claim in the Petition. A failure to advance a specific legal theory in a pleading is not necessarily fatal to a claim. "Delaware has adopted the system of notice pleading that the Federal Rules of Civil Procedure ushered in, which rejected the antiquated doctrine of the 'theory of the pleadings'—i.e., the requirement that a plaintiff must plead a particular legal theory." *HOMF II Inv. Corp. v. Altenberg*, 2020 WL 2529806, at *26 (Del. Ch. May 19, 2020). In this case, however, Jeremy *did* specifically plead the legal theory of knowing silence. For example, in Paragraph 10, Petitioner alleged that

> Due to their knowing silence and misrepresentations, Andrew and the brothers' lawyers at Mintz ensured that the erroneous language remained in the draft until executed by Jeremy, who was unaware of the change.

Pet. ¶ 10; *see also id.* ¶ 77 (alleging that "[b]y their silence and misdirection, Andrew and the brothers' agents at Mintz ensured that the language would remain in the draft agreement, unnoticed by Jeremy until after its execution"); *id.* ¶ 78 (alleging that "neither Andrew nor the brothers' attorneys at Mintz disclosed the change to Jeremy's Trust Agreement in any of the communications they exchanged with Jeremy . . .").

[32] Resp'ts' Opening Br. at 20 (quoting *In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894, at *20 (Del. Ch. Oct. 20, 2015)) (cleaned up).

13

existence of such agreement. The Petition identifies a March 6, 2019 memorandum from Gordon Fournaris reflecting that Jeremy would have the power to remove the Trust Protector from the Jeremy Trust. Gordon Fournaris's internal notes further reflect that there was an agreement for Jeremy to have removal power over the Trust Protector. The March 14, 2019 draft agreement provided Jeremy with control over the removal of the Trust Protector, including key terms that Andrew and Jeremy are alleged to have discussed with Mintz in December 2018. Jeremy agreed with the terms of that draft. The Petition therefore pleads facts supporting the existence of an antecedent agreement.

Jeremy adequately alleges the other elements of fraud as well.

> In order for a fraud claim to survive a motion to dismiss, a plaintiff needs to allege: (1) that a defendant made a false representation, usually one of fact; (2) with the knowledge or belief that the representation was false, or with reckless indifference to the truth; (3) with an intent to induce the plaintiff to act or refrain from acting; (4) that plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of her reliance on the representation.[33]

As discussed above, Jeremy has pled that Andrew and Mintz chose to exclude Jeremy and his counsel from emails discussing the March 20 change to the preference order and knew that Jeremy was unaware of the change, satisfying the first two elements of common-law fraud. Jeremy has alleged that Andrew did so in order to induce Jeremy to sign the Jeremy Trust Agreement, satisfying fraud's third element. Jeremy relied, and

---

[33] *Grunstein v. Silva*, 2009 WL 4698541, at \*12 (Del. Ch. Dec. 8, 2009) (citing *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992)); *accord Browne v. Robb*, 583 A.2d 949, 955 (Del. 1990); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

14

Andrew knew that he relied, on Andrew to make edits faithful to Jeremy's understanding of the trust arrangement, as demonstrated by their April 2 text exchange. At this stage, reliance on a brother's intent must be considered reasonable, satisfying the fourth element of fraud. Finally, Jeremy has alleged that he suffered damage by signing the Jeremy Trust Agreement and losing control over, and beneficial interest in, the assets that he transferred to the Trust, satisfying the last element of common-law fraud.

Therefore, Count II adequately alleges a claim for reformation based on Jeremy's alternative theories.

### C.     Count III for Declaratory Judgment Is Moot.

Jeremy seeks a declaration that the appointments of Chafkin and Edelman as Investment Direction Advisers for the Jeremy Trust and Trust Protectors and Distribution Advisers for the Andrew Trust were invalid. Respondents argue that Count III is moot because, effective May 19, 2021, Chafkin and Edelman resigned from those roles.

Under Article IV of the Delaware Constitution, this court may adjudicate only actual, ongoing cases or controversies.[34] "According to the mootness doctrine, although there may have been a justiciable controversy at the time litigation commenced, the action will be dismissed if that controversy ceases to exist."[35] A claim challenging the validity of a fiduciary's appointment becomes moot when the fiduciary resigns, as there is no longer

---

[34] Del. Const. art. IV, § 11; *see also State Farm Mut. Auto. Ins. Co. v. Davis*, 80 A.3d 628, 632 (Del. 2013) ("The function of this Court . . . is to decide actual, live controversies . . . [so] we do not answer questions that have become moot.").

[35] *Gen. Motors Corp. v. New Castle Cty.*, 701 A.2d 819, 823 (Del. 1997); *see also Glazer v. Pasternak*, 693 A.2d 319, 320 (Del. 1997).

an "actual controversy remaining between the parties" about whether the fiduciary was validly appointed.[36]

There are two limited exceptions to the mootness doctrine: matters of public importance and matters evading review but capable of repetition.[37] Jeremy invokes the latter exception, arguing that there are no safeguards against further appointments of conflicted fiduciaries in violation of the Trust Agreements. That exception, however, is only applicable where the impact of such repetition is irreversible.[38] That is not the case here. Jeremy pleads no facts suggesting that a conflicted fiduciary would be unable to be removed if appointed in the future. And to the extent that such fiduciary causes Jeremy harm, Jeremy pleads no facts indicating that monetary damages would be an insufficient remedy.

Jeremy is arguing for declaratory judgment concerning the removal of two fiduciaries who have already resigned. Because the requested relief has already been effectuated, Jeremy lacks standing to assert this claim. Accordingly, Respondents' motion to dismiss Count III is granted.

### D. Count IV Fails to State a Claim for Removal of Pomerance.

Jeremy seeks to remove Pomerance from "all fiduciary positions [he] presently occup[ies]" for the Andrew and Jeremy Trusts.[39] Respondents argue that the applicable

---

[36] *See Stearn v. Koch*, 628 A.2d 44, 46 (Del. 1993).

[37] *Gen. Motors Corp.*, 701 A.2d at 823 n.5.

[38] *See, e.g.*, *Texaco Refining & Mktg. Inc. v. Wilson*, 570 A.2d 1146, 1147 (Del. 1990).

[39] Pet. ¶ 185. Jeremy also asserts Count IV against Edelman and Chafkin, but their resignation renders those claims moot.

standard of conduct as established by the Trust Code is willful misconduct and that Jeremy has failed to allege that Pomerance has engaged in willful misconduct.[40]

Section 3303 of Delaware's Trust Code gives the governing instrument of a trust wide latitude to "restrict, eliminate, or otherwise vary . . . any such laws pertaining to . . . the grounds for removal of a fiduciary."[41] The sole limitation to this statutory grant of authority is that the governing instrument may not "preclude a court of competent jurisdiction from removing a fiduciary on account of the fiduciary's willful misconduct."[42]

Under Delaware's Trust Code, "willful misconduct" is defined as "intentional wrongdoing, not mere negligence, gross negligence or recklessness."[43] "[W]rongdoing" is further defined to mean "malicious conduct or conduct designed to defraud or seek an unconscionable advantage."[44] Removal "is an extreme form of equitable relief that should be exercised sparingly."[45]

Jeremy has not alleged facts sufficient to support a claim for removal of Pomerance for willful misconduct. Jeremy argues that he has alleged willful misconduct based on the March 24, 2021 stock sale, the purportedly invalid appointments, and the level of hostility

---

[40] Respondents further argue that, as a non-beneficiary, Jeremy does not have standing to bring these claims with respect to the Jeremy Trust. Because this decision grants Respondents' motion as to Count IV on other grounds, the court does not reach this issue.

[41] 12 *Del. C.* § 3303(a).

[42] *Id.*

[43] 12 *Del. C.* § 3301(g).

[44] *Id.*

[45] *Tigani v. Tigani*, 2021 WL 1197576, at *21 (Del. Ch. Mar. 30, 2021).

17

between Jeremy and the fiduciaries.[46]  But Jeremy does not explain how these activities meet the relevant standard.  As to the stock sale, Jeremy alleges that Pomerance gained from his sale of personal holdings in the stock offering by selling approximately 9.22% of his Skillz holdings and netting more than $764,000.  Jeremy does not tease out how this sale affected any decision made in connection with the Jeremy Trust.  Jeremy does not, for example, allege that Pomerance stood to gain by *not* selling stock of the Jeremy Trust.  Jeremy similarly fails to explain how merely appointing Edelman and Chafkin rose to the level of intentional wrongdoing.  Jeremy also fails to explain how "hostility" constitutes willful misconduct.  Jeremy fails to plead facts suggesting any untenable hostility between Jeremy and Pomerance in any event.[47]

In response, Jeremy disputes that willful misconduct is the appropriate standard.  Jeremy argues that Section 3581, which permits the "remov[al] [of] the trustee" to "remedy a breach of trust" absent willful misconduct, supplies the relevant standard.[48]

The court is skeptical of Jeremy's argument in light of Section 3303 of the Delaware Trust Code, which permits a trust instrument to "vary any laws of general application to fiduciaries, trusts, and trust administration" "*[n]otwithstanding* any other provision" of the Trust Code.[49]  Section 3303 further states that the "rule that statutes in derogation of the

---

[46] Pet'r's Answering Br. at 48–49.

[47] *Compare* Pet'r's Answering Br. at 49 *with Tigani,* 2021 WL 1197576, at *22 (declining to remove a trustee for hostility even after "years of insidious litigation").

[48] Pet'r's Answering Br. at 47; 12 *Del. C.* § 3581(b).

[49] 12 *Del. C.* § 3303(a) (emphasis added).

common law are to be strictly construed shall have no application to this section.  It is the policy of this section to give maximum effect to the principle of freedom of disposition and to the enforceability of governing instruments."[50]  The Trust Agreement provide contractual mechanisms for removing fiduciaries, suggesting an intent to vary and supplant the default statutory scheme.

In any event, under Jeremy's selected standard, Jeremy must demonstrate that removing Pomerance would provide an adequate remedy for any alleged breach of the Andrew or Jeremy Trust.  It is difficult to conceive how removing Pomerance would provide any adequate remedy independent of Jeremy's claim for reformation.

Count IV therefore fails to state a claim.

E.      **Count V Fails to State a Claim for Accounting.**

Jeremy seeks an order directing the Trustee to immediately produce an accounting for the Trusts.

Pursuant to Section 3522 of the Delaware Code, "[t]rustees of an inter vivos trust . . . shall not be required to file any accounts or inventories with respect to such trust, except . . . [u]pon an order of the Court of Chancery, for cause shown, expressly requiring an accounting by such trustees."[51]  To show cause, a petitioner must show more than "repeated requests for an accounting hav[ing] been denied."[52]

---

[50] 12 *Del. C.* § 3303.

[51] 12 *Del. C.* § 3522(2).

[52] *See Ughetta v. Cist*, 2015 WL 3430094, at *15 (Del. Ch. May 29, 2015).

Article 23(a) of the Trust Agreements provides that "[t]he Trustee . . . shall not be required to file with the Court of Chancery . . . any . . . inventory or accounts unless specifically ordered to do so on application of any beneficiary."[53]  The parties dispute whether this language encompasses a court order compelling the trustees to provide Jeremy with an accounting.  The court need not, however, reach that question.

Jeremy's only allegation is that, on April 3, 2021, the trustees provided Jeremy with an accounting dated March 23, 2021.  Jeremy contends that this was "misleading" because it "concealed" stock sales that occurred on March 24, 2021.[54]  But Jeremy pleads no other facts suggesting that this accounting was intended to be deceptive.  In fact, he acknowledges that he received an accounting upon request.  His concern appears to be that he viewed the accounting as "bare bones statements" that did not amount to a "full accounting."[55]  But he pleads no facts indicating that he requested further information or that they wrongfully refused him anything that he subsequently requested.  This does not rise to the level of "for cause shown" required by the statute.

Accordingly, Respondents' motion to dismiss Count V is granted.

**F.      Jeremy Did Not Fail to Join Necessary Parties.**

Respondents argue that the Petition should be dismissed because Jeremy failed to join the Trusts' beneficiaries, who are not properly represented in this action.  Because this decision dismissed all claims involving the Andrew Trust, this analysis addresses

---

[53] Pet. Ex. 1 § 23(a); Pet. Ex. 2 § 23(a).

[54] Pet. ¶ 144.

[55] *See* Pet. ¶¶ 19, 144.

Respondents' Rule 19(b) argument as to the Jeremy Trust only. The beneficiaries of the Jeremy Trust include Karen Anthony Paradise (Jeremy and Andrew's mother), Jeremy's present and future children, Andrew's future children, and the descendants of Jeremy's and Andrew's children.

Court of Chancery Rule 19(b) requires necessary parties to be joined to a suit if feasible, and if unfeasible, the court determines whether "in equity and good conscience the action should proceed among the parties before it."[56] "Courts have historically identified and included 'necessary' parties to a suit on the ground that those parties have 'rights which must be ascertained and settled before the rights of the parties to the suit can be determined.'"[57] In general, trustees and beneficiaries are both necessary parties in suits against either.[58] Beneficiaries, however, are not necessary parties if the beneficiaries' interests are not adversely affected by reformation of a trust.[59]

---

[56] Ct. Ch. R. 19(b).

[57] *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 289 (Del. 2016); *see also* 67A C.J.S. *Parties* § 3 (2021) ("[N]ecessary parties to a proceeding, regardless of its nature, that is, whether it is in rem, at law, or in equity, are those, and those only, who have an interest in the subject matter of the suit and whose rights may be materially affected or concluded by the judgment, and without whom the court will not proceed to a final determination of the controversy, even as between parties properly before the court."); *Tikiob v. Tikiob-Carlson*, 2020 WL 4036789, at *3–4 (Del. Ch. July 16, 2020) (finding that joinder of beneficiary was necessary because his "interests . . . would be impaired without his joinder as party to [the] action"), *report and recommendation approved*, 2020 WL 4474951, at *1 (Del. Ch. Aug. 3, 2020); *Germaninvestments AG v. Allomet Corp.*, 2020 WL 6870459, at *10–12 (Del. Ch. Nov. 20, 2020) (dismissing for failure to join "indispensable" nonparty beneficiaries of stock options).

[58] *See In re Lane's Will*, 97 A. 587, 587 (Del. Ch. 1916).

[59] *See Roos v. Roos*, 203 A.2d 140, 143 (Del. Ch. 1964).

> Necessary parties to a proceeding, regardless of its nature, that is, whether it is in rem, at law, or in equity, are those, and those only, who have an interest in the subject matter of the suit and whose rights may be materially affected or concluded by the judgment, and without whom the court will not proceed to a final determination of the controversy, even as between parties properly before the court.[60]

Joinder of beneficiaries is necessary if their "interests . . . would be impaired without [their] joinder as party to [the] action."[61] But joinder of beneficiaries is not necessary if their interests would "not be adversely affected by the reformation of the trust instrument."[62]

This action seeks to reform the Trust Agreements to implement the settlor's intent. It is difficult to conceive how doing so would adversely impact the beneficiaries of the Trusts. As further evidence that their interests would not be adversely affected, Karen Paradise and Jeremy's children have filed declarations in support of Jeremy's requests for relief.[63]

Accordingly, Jeremy has not failed to join a necessary party. Respondents' motion to dismiss under Rule 19(b) is therefore denied.

## III. CONCLUSION

For the foregoing reasons, Respondents' motion to dismiss is GRANTED as to Counts III, IV, and V and DENIED as to Counts I and II.

---

[60] *Hazout*, 134 A.3d at 289 n.56; *accord* Ct. Ch. R. 19.

[61] *See Tikiob*, 2020 WL 4036789, at *3–4 (Del. Ch. July 16, 2020).

[62] *Roos*, 203 A.2d at 143.

[63] *See* Dkt. 42 Exs. 3–4.

22