# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KIMBERLY HUTCHERSON and STEPHEN HUTCHERSON, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2024-0340-BWD |
| VILLAS AT BAY CROSSING CONDOMINIUM ASSOCIATION, INC., a Delaware corporation, and KEY PROPERTIES GROUP, LLC, a Delaware limited liability company, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION
## RESOLVING DEFENDANTS' MOTIONS TO DISMISS

Date Submitted: November 20, 2024
Date Issued: January 8, 2025

Richard E. Berl, Jr., HUDSON, JONES, JAYWORK & FISHER, LLC, Lewes, Delaware; *Attorneys for Plaintiffs Kimberly Hutcherson and Stephen Hutcherson.*

Alan D. Albert, O'HAGAN MEYER PLLC, Wilmington, Delaware; *Attorneys for Defendant Villas at Bay Crossing Condominium Association, Inc.*

R. Eric Hacker, MORRIS JAMES LLP, Wilmington, Delaware; *Attorneys for Defendant Key Properties Group, LLC.*

**DAVID, V.C.**

The plaintiffs in this action, Kimberly Hutcherson and Stephen Hutcherson ("Plaintiffs"), are siblings who own condominium units in the Villas at Bay Crossing Condominium in Lewes, Delaware (the "Condominium"). The Condominium is maintained by Villas at Bay Crossing Condominium Association, Inc. (the "Association"), a Delaware corporation.

Defendant Key Properties Group, LLC ("Key") plans to operate a restaurant on a parcel of land adjacent to the Condominium. To provide additional parking for the restaurant, Key and the Association entered into a Purchase and Sale Agreement through which Key agreed to purchase, and the Association agreed to sell, parking spaces in Condominium common areas. That agreement was subject to the unanimous approval of the Condominium unit owners, however, and the unit owners did not approve the sale. So Key and the Association instead entered a series of agreements purporting to lease the common parking areas to Key for as long as its restaurant continues to use them, and to permit Key to pledge the spaces as collateral for a construction loan. According to Plaintiffs, despite voting against a sale, unit owners can no longer access common areas to which they are entitled due to Key's purported "perpetual" leases.

Through this action, Plaintiffs challenge the validity of the leases, alleging claims for breach of fiduciary duty, violation of the Delaware Unit Property Act ("UPA") and provisions of the Association's governing documents, and trespass.

Defendants have moved to dismiss. For reasons explained below, Plaintiffs' claims for breach of fiduciary duty and trespass are dismissed and the motions are otherwise denied.

## I. BACKGROUND[1]

### A. The Condominium, The Association, And The Governing Documents

The Condominium is a residential condominium community in Lewes, Delaware, established in 2004 under the UPA.[2] The Association is a nonprofit Delaware corporation tasked with managing the Condominium. The Association is governed by external authorities—the Delaware General Corporation Law ("DGCL"), the UPA, and the Delaware Uniform Common Interest Ownership Act ("DUCIOA")—and internal authorities—a Declaration of Condominium (the "Declaration") and a Code of Regulations (the "COR," and with the Declaration, the "Governing Documents"). Am. Compl., Ex. M [hereinafter Decl.]; *id.*, Ex. N [hereinafter COR].

---

[1] The following facts are taken from Plaintiffs' First Amended Verified Complaint for Declaratory Judgment and Injunctive Relief (the "Amended Complaint") and the documents incorporated by reference therein. Pls.' First Am. Verified Compl. for Decl. J. and Injunctive Relief [hereinafter Am. Compl.], Dkt. 13. *See Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint[.]" (citing *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 1594085, at *12 (Del. Ch. June 29, 2005))), *aff'd*, 58 A.3d 414 (Del. 2013).

[2] 12 *Del. C.* §§ 2201–2246.

2

The Condominium consists of residential "Units" owned by "Unit Owners" and community "Common Elements" owned in common by all Unit Owners. The Declaration defines "Residential General Common Elements" to include "[t]he parking areas shown on the Residential Land on Declaration Plan which are not otherwise Residential Limited Common Elements" and provides that "[t]he parking spaces, other than those designated as Residential Limited Common Elements shall be available to Residential Unit Owners, their guests, invitees, etc., on a 'first-come, first-serve' basis[.]" Decl. § 10(b)(5). Similarly, the COR states that:

> Those parking areas designated and identified on the Declaration Plan recorded simultaneously with the Declaration of this Code of Regulations (excluding those parking areas within the individual Units designated as a garage or carport) shall be Common Elements and shall be available for use on a non-exclusive basis by the Unit Owners and their respective guests and invitees on a "first-come, first-serve" basis and shall be subject to such reasonable rules and regulations that may be promulgated from time to time by the Council.

COR Art. V, § 14.

**B.    The Association Leases Parking Spaces.**

Sometime before 2019, the Association's board of directors (the "Council") executed a lease agreement with a restaurant known as Lazy Susan's, located at 18289 Coastal Highway ("Parcel 72"), adjacent to the Condominium. Am. Compl. ¶ 11. Under that lease agreement, the Association permitted Lazy Susan's patrons to use parking spaces owned by the Condominium for three summer months in exchange for $3,500 in rent. *Id.*

3

Defendant Key Properties Group, LLC ("Key") owns a 38,000 square foot parcel of real property, located at 18315 Coastal Highway ("Parcel 74"), to the south of the Condominium and adjacent to Parcel 72 where Lazy Susan's was located. *Id.* ¶ 7; *id.*, Ex. A. Since 2016, Key has planned to operate a restaurant on Parcel 74. *Id.* ¶ 8. In November 2016, Key presented an application to the Sussex County Board of Adjustment for variances to provide sufficient on-site parking for a restaurant. *Id.* ¶ 9; *id.*, Ex. B. But the Board of Adjustment determined "that the property would still not provide sufficient parking" and "no activity in pursuit of the variances took place during the following year . . . ." *Id.* ¶ 10; *id.*, Ex. B.

In 2019, Key offered to purchase parking spaces owned by the Condominium (the "Parking Spaces") in order to expand the parking available for a restaurant on Parcel 74. *Id.* ¶ 12. On January 1, 2020, the Association executed a Purchase and Sale Agreement to sell the Parking Spaces to Key, subject to the unanimous approval of the Condominium Unit Owners.[3] *Id.* ¶¶ 12-13.

The Association did not obtain the unanimous approval of the Unit Owners. *Id.* ¶ 13. So instead, the Association and Key executed a Lease with Option to

---

[3] *See* 25 *Del. C.* § 2229 ("Property may be removed from the provisions of this chapter by a revocation expressing the intention to so remove property previously made subject to the provisions of this chapter. No such revocation shall be effective unless the same is executed by all of the unit owners and by the holders of all mortgages, judgments or other liens affecting the units, and is duly recorded.").

Purchase (the "2020 Lease"). *See id.*, Ex. D. Under the 2020 Lease, the Association agreed to lease Parking Spaces to the north of Parcel 74 to Key in exchange for $5,000 per year in rent. *Id.* ¶¶ 13-14, 16. The 2020 Lease stated that:

> This lease shall commence on the 1st day of July 2020 (Effective Date) and continue until the property has been purchased by [Key] or, if [the Association] cannot, by the exercise of continued due diligence, obtain the required unanimous consents of all property owners in the Villas at Bay Crossing to the removal of the property from the condominium plan and the sale of the property to [Key], this lease shall terminate on the expiration of the final lease term provided for herein. The initial lease term shall expire on June 30, 2025. If [the Association] has not obtained the unit owner consents required to remove the property from the condominium plan for the Villas at Bay Crossing within the initial term of this lease, the lease shall continue thereafter until the property has been legally removed from the condominium and sold to [Key].

*Id.*, Ex. D § 2. The 2020 Lease also provided that:

> [Key] shall have an ongoing option to purchase the leased premises for a purchase price of $300,000.00, less any unused rents paid under this lease . . . . The option to purchase shall be exercised by [Key] by giving 30 days['] notice of [Key's] intent to exercise the option, in writing to [the Association] after [the Association] has obtained the required consents and removed the property from the condominium plan.

*Id.* § 7.

After the 2020 Lease was signed, Key relocated a white picket fence along the Condominium's northern boundary to allow access to the Parking Spaces from Parcel 74. Am. Compl. ¶ 15. In March 2021, Key purchased a Unit in the Condominium for "better access" to the Council. *Id.* ¶ 19.

5

On July 7, 2022, the Association and Key executed a Parking Lease Agreement (the "2022 Lease") under which the Association agreed to lease forty additional Parking Spaces to the east of Parcel 74 once Key opened its restaurant. *Id.* ¶ 23; *id.*, Ex. I.

On November 19, 2022, the Association and Key executed a First Amendment to Lease with the Option to Purchase (the "2022 Amendment"). *Id.*, Ex. J. The 2022 Amendment included an additional provision that obligated Key, "at its expense, [to] extend the existing perimeter fence between Tax [P]arcel 74 and the . . . Condominium property and add an access gate near the middle or center of that fence line to provide pedestrian access between the Condominium property and the restaurant." *Id.* ¶ 3. Several months later, in accordance with the 2022 Amendment, Key and the Association erected a fence separating the Parking Spaces from the rest of the Condominium property. Am. Compl. ¶ 25; *id.*, Ex. J ¶ 3. This fence, combined with the previously relocated fence, impedes traffic through portions of the Condominium. Am. Compl. ¶ 15.

As of July 2023, the Council consisted of just two members—Michael Fannin, who was also a representative of Key, and Kenneth Bay. *Id.* ¶ 47. On July 14, 2023, the Association and Key executed an "Amendment of Leases," which restated and extended the terms of the three existing leases (*i.e.*, the 2020 Lease, the 2022 Lease, and the 2022 Amendment). *Id.*, Ex. K. Among other things, the Amendment of

6

Leases states that "the parties hereto confirm that said 0.299 acre [parking] area is and shall continue to be under lease or owned by [Key] as long as the business located on Tax Parcel 74 is using the 0.299 acre parking area to provide additional parking for said business[,]" and that Key's "interest in the 0.299 acre premises will be mortgaged as collateral security for [a construction] loan . . . ." *Id.*, Ex. K ¶¶ 4–5; *see also* Am. Compl. ¶ 26. The same day, the Association and Key executed a Memorandum of Lease to record with the Recorder of Deeds. *Id.* ¶ 27; *id.*, Ex. L.

## C. Procedural History

On April 1, 2024, Plaintiffs initiated this action through the filing of a Verified Complaint for Declaratory Judgment and Injunctive Relief (the "Initial Complaint"). Dkt. 1. Defendants moved to dismiss the Initial Complaint.[4]

---

[4] Def. Key Props. Gp., LLC's Mot. to Dismiss Pls.' Verified Compl., Dkt. 5; Mot. to Dismiss for Failure to State a Claim upon Which Relief May Be Granted of Def. Villas at Bay Crossing Condo. Ass'n, Inc., Dkt. 7.

In briefing on the present motion, the Association purports to incorporate all arguments raised in prior briefing on its motion to dismiss the Initial Complaint. *See* Mot. to Dismiss Am. Verified Compl. for Failure to State a Claim upon Which Relief May Be Granted, Failure to Join Indispensable Parties, Failure to Meet the Pleading Requirements of Rule 23.1, and Misjoinder of Def. Villas at Bay Crossing Condo. Ass'n 4 [hereinafter Ass'n OB], Dkt. 16. Parties cannot circumvent the word limits imposed by the Court of Chancery Rules by purporting to incorporate by reference all arguments raised in connection with prior motions; rather, if parties wish for the Court to consider certain arguments, they must fairly present them in the operative briefs. *See Smernoff v. King's Grant Condo. Ass'n, Inc.*, 2024 WL 3384826, at *5 n.51 (Del. Ch. July 12, 2024) (first citing *Riker v. Teucrium Trading, LLC*, 2020 WL 2393340, at *10 n.96 (Del. Ch. May 12, 2020); and then citing *Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 502

7

On July 26, 2024, Plaintiffs filed the operative Amended Complaint. The Amended Complaint alleges that the 2020 Lease, the 2022 Lease, the 2022 Amendment, and the Amendment of Leases (collectively, the "Leases") are void and seeks injunctive relief. Am. Compl. at 22-23.[5]

## II. ANALYSIS

Defendants have moved to dismiss the Amended Complaint under Court of Chancery Rules 12(b)(6) and 23.1.

When reviewing a motion to dismiss under Court of Chancery Rule 12(b)(6), Delaware courts "(1) accept all well pleaded factual allegations as true, (2) accept

---

n.77 (Del. 2019)) (declining to consider arguments that were not fairly presented in the trial briefs).

[5] On September 4, 2024, the Association and Key moved to dismiss the Amended Complaint. *See* Ass'n OB; Def. Key Props.' Mot. to Dismiss Pls.' First Am. Verified Compl. [hereinafter Key OB], Dkt. 17. The next day, the Association filed a joinder to portions of Key's motion to dismiss. Joinder of Def. Villas at Bay Crossing Condo. Ass'n, Inc., to Certain Portions of Opening Br. of Def. Key Props., LLC, in Support of Its Mot. to Dismiss the Am. Verified Compl. for Failure to State a Claim, Dkt. 18. On September 24, 2024, Plaintiffs filed answering briefs in opposition to the Association's and Key's motions to dismiss. Pls.' Answering Br. in Opp'n to Def. Key Props.' Mot. to Dismiss Am. Compl. [hereinafter Pls.' Key AB], Dkt. 22; Pls.' Answering Br. in Opp'n to Def. Villas [at] Bay Crossing's Mot. to Dismiss Am. Compl., Dkt. 23. On October 7, 2024, the Association filed its Reply Brief in Further Support of Its Motion to Dismiss. Reply Br. of Def. Villas at Bay Crossing Condo. Assn., Inc. in Further Support of Its Motion to Dismiss Pls. Kimberly Hutcherson's and Stephen Hutcherson's Am. Verified Compl. for Failure to State a Claim upon Which Relief May Be Granted, Failure to Join Indispensable Parties, Failure to Meet the Pleading Requirements of Rule 23.1, and Misjoinder, Dkt. 26. The next day, Key filed its Reply Brief in Support of Its Motion to Dismiss. Def. Key Props. Gp., LLC's Reply Br. in Support of Its Mot. to Dismiss Pls.' First Amended Verified Compl., Dkt. 27. The Court heard oral argument on November 20, 2024. JAF, Dkt. 32.

even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party . . . ." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

Similarly, "[w]hen considering a motion to dismiss a complaint for failing to comply with Rule 23.1, the Court does not weigh the evidence, must accept as true all of the complaint's particularized and well-pleaded allegations, and must draw all reasonable inferences in the plaintiff's favor." *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1048 (Del. 2021) (citing *White v. Panic*, 783 A.2d 543, 549 (Del. 2001)).

The Amended Complaint does not style the claims alleged therein as "counts," but appears to assert three causes of action: (1) a claim for breach of fiduciary duty; (2) a claim to enforce provisions of the UPA and Governing Documents that (according to Plaintiffs) prohibit the Leases; and (3) a claim for trespass against Key.[6]

---

[6] The Amended Complaint also alleges a claim for violation of 8 *Del. C.* § 211, but on September 18, 2024, the parties stipulated to dismiss that claim in favor of a separate action. Dkt. 21; *see also* Verified Compl. to Compel Meeting of S'holders/Members Under 8 *Del. C.* § 211, *Hutcherson v. Villas at Bay Crossing*, C.A. No. 2024-0873-BWD (Del. Ch.

## A.    The Breach Of Fiduciary Duty Claim

Paragraphs 41 through 46 of the Amended Complaint allege a claim for breach of fiduciary duty.[7]

"To recover for a breach of fiduciary duty, a plaintiff must prove two basic elements: that the defendant owed a fiduciary duty and that the defendant breached the duty owed." *Beach to Bay Real Est. Ctr. LLC v. Beach to Bay Realtors Inc.*, 2017 WL 2928033, at *5 (Del. Ch. July 10, 2017, revised July 11, 2017) (citing *ZRii, LLC v. Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at *11 (Del. Ch. Sept. 21, 2009)). It follows that "to survive a motion to dismiss, th[e] [c]omplaint must sufficiently plead the existence of a fiduciary duty, and a breach of such a duty." *Id.*

Problematically, Plaintiffs have not sued a fiduciary. The Amended Complaint does not name any Association director or officer as a defendant. To the extent Plaintiffs seek a determination that the Association's directors or officers have breached a fiduciary duty, those individuals must be given an opportunity to defend their conduct. *See August v. Glade Prop. Owners Ass'n, Inc.*, 2023 WL 3359466, at *4 (Del. Ch. May 11, 2023) (dismissing fiduciary duty claims where "Plaintiff has

---

dismissed Dec. 31, 2024), Dkt. 1.  On December 31, 2024, the parties stipulated to dismiss that action with prejudice.  Granted (Stipulation of Dismissal), *Hutcherson v. Villas at Bay Crossing*, C.A. No. 2024-0873-BWD (Del. Ch. dismissed Dec. 31, 2024), Dkt. 10.

[7] *See* Am. Compl. at 15 ("The VBC Directors and Officers Have Breached Their Fiduciary Duties."); *id.* ¶¶ 41–46 (alleging that the Council members breached duties of care and loyalty); *id.* ¶ 56 (referencing "claims for breach of fiduciary duty").

10

not named any individual director or officer of the Association as a defendant in this action"), *exceptions den.*, 2023 WL 5423220 (Del. Ch. Aug. 23, 2023), *and exceptions den.*, 2023 WL 5431953 (Del. Ch. Aug. 23, 2023).

The only defendants who *are* named as defendants in this action—Key and the Association—do not owe fiduciary duties to Plaintiffs. Plaintiffs concede that Key does not "owe[] Plaintiffs a fiduciary duty."[8] And to the extent the Amended Complaint might be interpreted to allege a claim against the Association, "the Association does not owe fiduciary duties. Fiduciary duties are owed to, not by, the corporation." *Id.*; *see also, e.g.*, *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1135 (Del. 2020) ("[T]he corporation itself does not owe fiduciary duties[.]"); *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 539 (Del. 1996) ("Fiduciary duties are owed by the directors and officers to the corporation and its stockholders."); *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992) ("The only defendant is the corporate entity, . . . so there are no fiduciary duty claims.").

Because none of the defendants in this litigation are fiduciaries, Plaintiffs' claim for breach of fiduciary duty must be dismissed.

---

[8] Pls.' Key AB 19 ("The Amended Complaint does not allege that Key Properties owed Plaintiffs a fiduciary duty.").

11

### B. Claims To Enforce The UPA And Governing Documents

Paragraphs 28 through 35 of the Amended Complaint seek to enforce provisions of the UPA and Governing Documents that, according to Plaintiffs, prohibit the Leases.[9] Defendants argue that Plaintiffs lack derivative standing to assert such claims; two provisions of the COR bar Plaintiffs' claims; and, in any event, the Amended Complaint fails to adequately allege any violation of the UPA or the Governing Documents.

#### 1. Plaintiffs' Claims To Enforce The UPA And Governing Documents Are Not Derivative.

Defendants contend that Plaintiffs' claims seeking to enforce the UPA and Governing Documents are derivative, and move to dismiss under Rule 23.1 for failure to plead that demand was futile or wrongfully refused.[10]

Section 2210 of the UPA provides an "aggrieved unit owner" "in a proper case" with statutory standing to bring "an action for the recovery of damages or for injunctive relief or both" for "[f]ailure to comply with the code of regulations and with such rules governing the details of the use and operation of the property and the use of the common elements . . . and with the covenants, conditions and restrictions

---

[9] *See* Am. Compl. ¶¶ 28–31 (alleging that the Leases violate the UPA); *id.* ¶¶ 32–33 (alleging that the Leases violate the Declaration); *id.* ¶¶ 34–35 (alleging that the Leases violate the COR).

[10] According to Defendants, Plaintiffs made a demand on the Council before initiating this action. *See* Ass'n OB 8–9; Key OB 18–19.

set forth in the declaration . . . ." 25 *Del. C.* § 2210. This Court has interpreted the phrase "in a proper case" to impose a demand requirement when a unit owner seeks to assert a claim derivatively.[11]

To determine whether a claim is direct or derivative, Delaware courts consider "who suffered the alleged harm" and "who would receive the benefit of any recovery or other remedy[.]" *Ramco Asset Mgmt., LLC v. USA Rare Earth, LLC*, 2024 WL 1716399, at *9 (Del. Ch. Apr. 22, 2024) (quoting *Tooley v. Donaldson, Lufkin & Jennette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)). If a claim is derivative, "the plaintiff must plead that (1) a demand was made on the entity or (2) reasons why

---

[11] *See Breedy-Fryson v. Towne Ests. Condo. Owners Ass'n, Inc.*, 2010 WL 718619, at *14 (Del. Ch. Feb. 25, 2010) ("[T]o the extent that the General Assembly was going to allow unit holders to assert claims belonging to an owners association, it intended, by the words 'proper case,' to impose a demand excusal requirement as is typical not only when stockholders attempt to bring derivative claims, but also when limited partners, equity holders in limited liability companies, and beneficial owners of statutory trusts do so." (footnotes omitted) (first citing 25 *Del. C.* § 2210; then citing Ct. Ch. R. 23.1; then citing 6 *Del. C.* § 17-1003; then citing 6 *Del. C.* § 18-1003; and then citing 12 *Del. C.* § 3816(a))); *Kablaoui v. Gerar Place Condo. Ass'n*, 2022 WL 1617729, at *6 n.91 (Del. Ch. May 20, 2022) (following *Breedy-Fryson*), *exceptions denied*, 2022 WL 17827089 (Del. Ch. Dec. 21, 2022), *aff'd*, 303 A.3d 1219 (Del. 2023).

The Condominium, which was established in 2004, is a "preexisting" community under the DUCIOA. *See* 25 *Del. C.* § 81-119. Section 81-417 of the DUCIOA, which applies to pre-existing communities, states that "[i]f a declarant or any other person subject to this chapter fails to comply with any of its provisions or any provision of the declaration or bylaws, *any person* or class of persons *adversely affected by the failure to comply has a claim for appropriate relief*." 25 *Del. C.* § 81-417 (emphasis added). Unlike Section 2210 of the UPA, Section 81-417 of the DUCIOA does not limit standing to "a proper case." But the Court does not need to resolve whether Section 81-417 eliminates the requirement to demonstrate derivative standing because, as explained below, claims to enforce the UPA and Governing Documents are not derivative.

making such demand on the entity would be futile." *Id.* (first citing Ct. Ch. R. 23.1(a)(1); and then citing *Zuckerberg*, 250 A.3d at 877).

Plaintiffs' claims to enforce the UPA and Governing Documents are not derivative. Causes of action to enforce statutory rights or contract rights under a corporation's governing documents[12] can be asserted directly. *See Sykes v. Touchstream Techs., Inc.*, 2024 WL 1299928, at *12 (Del. Ch. Mar. 27, 2024) ("As owners of [the company's] stock, Plaintiffs can exercise their rights to bring direct actions against the Company for . . . violations of specific provisions of the DGCL."); *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1049-50 (Del. Ch. 2015) ("Stockholders . . . can sue directly to enforce contractual constraints on a board's authority under the charter, bylaws, and provisions of the DGCL." (first citing *Grimes v. Donald*, 673 A.2d 1207, 1213 (Del. 1996); and then citing *Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, *5 (Del. Ch. Aug. 16, 2010))).[13]

---

[12] *See Council of Dorset Condo. Apartments v. Gordon*, 801 A.2d 1, 5 (Del. 2002) ("A condominium declaration and its accompanying code of regulations together form no more than an ordinary contract between the unit owners (and, initially, the developer), created under the statutory framework of the Unit Properties Act." (citing *Linden Knoll Condo. Ass'n v. McDermott*, 1994 WL 555361 (Del. Super. Aug. 19, 1994))).

[13] *See also Hague v. Bay Landing Poa, Inc.*, 2022 WL 2541347, at *9 (Del. Ch. July 7, 2022) ("Because Plaintiffs appear to be suing to enforce contractual constraints on the Board's authority under the POA's governing documents, this would be a direct claim against the POA corporation that is not subject to dismissal for failure to make a demand." (footnote omitted)).

The *Tooley* factors confirm that analysis. It is the Unit Owners—not the Association—who suffer the alleged harm because they cannot access areas owned in common with the other Unit Owners. And the remedy—regaining access to those common elements—would flow to the Unit Owners, not the Association.[14]

Because Plaintiffs' enforcement claim is not derivative, I do not reach Defendants' arguments that Plaintiffs failed to plead that demand was futile or wrongfully refused.

### 2. The COR Does Not Prohibit Plaintiffs From Bringing Direct Claims To Enforce The UPA And Governing Documents.

Defendants point to two provisions in the COR that purportedly prevent Plaintiffs from asserting direct claims to enforce the UPA and Governing Documents.

---

Defendants cite *Kablaoui* to support their argument that Plaintiffs' claims are derivative rather than direct. 2022 WL 1617729, at *3. But that decision did not hold that a unit owner's claims to enforce provisions of a declaration could not be brought directly. In fact, in that case, the Court addressed the merits of the unit owners' direct claim that defendants had breached their contractual duties under the declaration, before separately addressing the unit owners' derivative breach of fiduciary duty claims. *See id.* at *3–6; *see also id.* at *7 (acknowledging that "[d]irect claims include contractual rights that the stockholder, or member, holds against the corporation" (first citing *Tooley*, 845 A.2d at 1039; and then citing *Activision*, 124 A.3d at 1049–50)).

[14] As Plaintiffs explain, the Amended Complaint "does not allege an injury to the corporation." Pls.' Key AB 13. Rather, Plaintiffs allege that the Association itself, "in league with Key," "has committed the wrong[,]" and Plaintiffs "are seeking redress for direct injuries to them as property owners, not injuries suffered by the . . . [A]ssociation." Pls.' Key AB 12-13.

First, Defendants point to Article III, Section 2 of the COR, which states that:

> the Council shall have the power to, and be responsible for . . . (i) Enforcing by legal means . . . the provisions of the Declaration, this Code of Regulations and the Rules and Regulations for the use of the Property adopted by it, and bringing any proceedings which may be instituted on behalf of the Unit Owners.

COR Art. III, §§ 2, 2(i). According to Defendants, this provision vests the Council with the "exclusive authority" to pursue litigation concerning the rights of Unit Owners. By its plain terms, however, Article III, Section 2 gives the Council the power—but not the *exclusive* power—to enforce the COR.

If Article III, Section 2 could reasonably be read to divest Unit Owners of the power to bring direct claims to enforce the COR, it arguably would run afoul of both Section 2210 of the UPA and Article V, Section 1(a) of the COR, which create mandatory rights[15] for an aggrieved unit owner to maintain an action to enforce the code of regulations.[16]

---

[15] "[W]hen construing [a] statute, 'shall' generally signals [a] mandatory requirement . . . ." *Manti Hldgs, LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1219 (Del. 2021) (first quoting *GMG Cap. Invs., LLC v. Athenian Venture P'rs I*, 36 A.3d 776, 782 n.20 (Del. 2012); and then quoting *Arnold v. State*, 49 A.3d 1180, 1183 (Del. 2012)).

[16] *See* 25 *Del. C.* § 2210 ("*Failure to comply with the code of regulations* and with such rules governing the details of the use and operation of the property and the use of the common elements as may be in effect from time to time and with the covenants, conditions and restrictions set forth in the declaration or in deeds of units or in the declaration plan *shall be grounds for an action* for the recovery of damages or for injunctive relief or both maintainable . . . in a proper case *by an aggrieved unit owner . . . .*" (emphasis added));

16

Defendants assert that "a condominium may delegate to its council the right to sue on behalf of unit owners with respect to Common Elements" and thereby deprive unit owners of "standing to sue directly with respect to common elements."[17] But the only authority on which Defendants rely—*Epps v. Park Centre Condominium Council*, 2000 WL 1211163 (Del. Super. Aug. 18, 2000)—does not support that position. In *Epps*, a unit owner brought a counterclaim against his condominium association for damages arising from its failure to repair roof leaks and foundation cracks in common areas. *Id.* at *1. The code of regulations delegated the *exclusive* power to make repairs to the Council, but expressly provided that "[i]n the event that the Council fails to maintain the project in accordance with its duties hereunder, any unit owner . . . shall have the right to compel the specific performance of the Council in a court of equity." *Id.* at *2–3. The court acknowledged that the unit owner retained the right to bring claims for "specific performance" of his rights

---

COR, Art. V, § 1(a) (same). A provision in the governing documents that "seeks to waive a statutory right or requirement is unenforceable." *Loew's Theatres, Inc. v. Com. Credit Co.*, 243 A.2d 78, 81 (Del. Ch. 1968) (citing *Gaskill v. Gladys Belle Oil Co.*, 146 A. 337 (Del. Ch. 1929)); *see also* 25 *Del. C.* § 2208 ("The code of regulations . . . may include other *lawful* provisions . . . ." (emphasis added)); *Gaskill*, 146 A. at 340 ("That which is superior over-rides all below it in rank. . . . [T]he charter if it conflicts with the statute must give way . . . .").

[17] Key OB 21-22.

17

under the governing documents and the right to bring other direct claims.[18]  Nothing

in *Epps* suggests that a code of regulations may eliminate the unit owners' ability to

bring a direct claim to enforce the condominium's governing documents.

Second, the Association contends that Article V, Section 17 of the COR bars

Plaintiffs from bringing their enforcement claims without first obtaining the

approval of sixty-seven percent of the Unit Owners.  That provision states, in part:

> Due to the potential adverse financial impact to the Association and the
> Unit Owners of defending or pursuing any administrative, legal or
> equitable proceeding or action in connection with any dispute, claim,
> cause of action or proceeding arising out of or under or in connection
> with the Declaration, the Code of Regulations or the Declaration Plan
> (collectively the "Legal Proceedings"), ***the decision to initiate any
> Legal Proceedings*** (except for the recovery of dues and assessments
> from Unit Owners) and for those matters or causes of actions that would
> arise under Article X below or as otherwise provided under 25 [*Del. C.*]
> § 2210, ***must be made by a resolution*** duly adopted at a properly
> noticed regular or special meeting of the Association held for such
> purpose. ***Such resolution shall require the affirmative vote of the Unit
> Owners representing not less than sixty-seven percent*** (67%) of the
> Unit Owners and at least fifty-one percent (51%) of the holders of the
> first mortgagees upon the Units.[19]

---

[18] *Epps*, 2000 WL 1211163, at *6 ("While the Court must follow the mandate of the
statutory and regulatory scheme setup by the UPA and the Code of Regulations, the Court
sees no reason why [the plaintiff] does not have a claim for recovery for physical damages
that were sustained to his individual units for fixtures and chattels contained therein.").

[19] Article V, Section 17 goes on to state:

> If the Association shall incur or potentially be obligated as a result of such
> resolution to incur attorney's fees, expert fees or other costs or expenses
> associate[d] with such Legal Proceedings, totaling in excess of $25,000.00
> or if the amount recoverable by an attorney for the Association pursuant to a

COR Art. V, § 17 (emphasis added).

---

contingency fee agreement shall exceed $50,000.00, then such resolution shall require the affirmative vote of the Unit Owners representing not less than seventy-five percent (75%) percent [sic] of the Unit Owners and their mortgagees. Neither the Council, the Association nor the Unit Owners shall borrow on behalf of the Association nor use any funds from reserves of the Association to pay such legal costs, but the same shall be paid from and limited to the amounts provided in the annual budget for such expenditures for the fiscal year and shall be raised by special assessment levied against the Unit Owners for such purpose. If such Legal Proceedings are not concluded within one (1) year of the date of such resolution, the continued prosecution of such Legal Proceedings beyond such period must be reaffirmed annually at a special meeting held for such purpose by the percentage vote of the Association as was required to adopt the original resolution. If the continued prosecution of such Legal Proceedings is not reaffirmed, the action shall be discontinued and the Council shall have no further authority to act as the attorney-in-fact for the Association in the further prosecution or defense of such Legal Proceedings but may, with the affirmative vote of a majority of the vote in the Association, act as its attorney-in-fact with respect to any settlement or compromise of such Legal Proceedings; provided the same is completed within six (6) months thereafter. If the Association, by resolution approved in accordance with this section, authorizes the Council to initiate Legal Proceedings, then the decisions relating to the conduct of the Legal Proceedings shall be made by the Council for such purposes. Any action regarding the conduct of the Legal Proceedings shall be approved by a percentage vote of not less than sixty-seven percent (67%) or more of the Unit Owners. Decisions regarding the conduct of any Legal Proceedings are nondelegable. Notwithstanding anything contained herein or in the Declaration to the contrary, the provisions of this Section shall not be modified or amended without Developer's written consent so long as Developer owns any property within the Condominium; thereafter this Section shall not be modified or amended except by a written instrument, executed by the Unit Owners representing not less than sixty-seven percent (67%) of the Unit Owners and at least fifty-one percent (51%) of the holders of the first mortgagees upon the Units, and be recorded among the land records of Sussex County.

COR Art. V, § 17.

19

The parties offer conflicting interpretations of Article V, Section 17. The Association argues that, on its face, the provision requires a plaintiff to obtain the approval of sixty-seven percent of the Unit Owners before filing any derivative claim implicating the Governing Documents.[20] In contrast, Key, against its own interests, concedes that Article V, Section 17 likely was not intended to bar derivative claims brought by Unit Owners, as "it would be cognitively disjunctive to say that the people who are owed fiduciary duties" lack a remedy unless a supermajority of the Unit Owners with the power to control the Council "agree to join in the lawsuit."[21]

---

[20] *See* Draft Oral Arg. Tr. at 4–5 ("I do think that the section raises a strong probability that *derivative* claims need to have owner approval by the supermajority set out in this section to advance." (emphasis added)); *id.* at 6 ("[T]here is a very good argument that the amendment that added *derivative* claims should have an owner approval by the relevant supermajority in order to move forward." (emphasis added)).

[21] *Id.* at 33; *id.* at 31–32 ("I don't think that any court has ever interpreted this type of language to bar a *derivative* claim. And in all honesty, I can think of a policy reason why it wouldn't be read that way, because if . . . we think about it in the context in which derivative actions are often brought . . . if . . . 67 percent of the shareholders have to approve the bringing of a derivative action, . . . you're saying the people who essentially control the entity have to decide whether the entity can be sued because 67 percent is enough to replace the board. . . . [I]t would seem strange to me to put the decision whether to bring a derivative suit in the hands of the people who control the board in the first place." (emphasis added)).

Instead, Key suggests Article V, Section 17 of the COR more likely was intended "to protect the developer from lawsuits during the period of time that the developer still controlled the [A]ssociation" by operating "as a bar against the Association's board or council going rogue and initiating litigation that may ultimately fall upon the unit members in terms of a special assessment to pay for the litigation later." *Id.* at 26, 29; *see also id.* at 27 ("[W]hen we get to the part about a third of the way down when it talks about the Association initiated proceedings, all of that starts to make sense. Before *the Association*

Plaintiffs agree that the provision should not be interpreted to foreclose a Unit Owner from asserting derivative claims. But no party has argued that Article V, Section 17 should operate to bar Plaintiffs from bringing a *direct* claim. Since Plaintiffs bring their claims to enforce the UPA and Governing Documents directly, I do not further consider whether Article V, Section 17 could operate to bar Plaintiffs' claims if they were derivative.

### 3. It Is Reasonably Conceivable That The Leases Violate The Governing Documents.

Defendants argue that even if Plaintiffs' enforcement claims are direct, they nevertheless fail to state a claim because the Amended Complaint does not sufficiently allege that the Leases violate any provision of the UPA or Governing Documents. I disagree.

The Amended Complaint alleges that by blocking Unit Owners' access to the Parking Spaces, the Association has violated Section 2205 of the UPA, which states that "[t]he undivided interest in the common elements may not be separated from the unit to which such interest pertains" and entitles unit owners to "use the common elements in accordance with the purpose for which they are intended . . . ." 25 *Del. C.* § 2205. It further alleges that by perpetually leasing the Parking Spaces, the

---

starts taking on an affirmative obligation of litigation, . . . the decision to 'initiate any legal proceedings' and for the matters in Article X and Section 2210, must be by resolution." (emphasis added)).

Association has violated Section 2229 of the UPA, which provides that "[p]roperty may be removed from the provisions of" the UPA only through a recorded revocation "executed by all of the unit owners and by the holders of all mortgages, judgments or other liens affecting the units . . . ." 25 *Del. C.* § 2229. Under Delaware law, "[p]ermanent leasehold estates, renewable forever," are "considered to be estates in fee simple[.]" 25 *Del. C.* § 304. It is, therefore, reasonably conceivable that a perpetual lease constitutes a "removal" of common property in contravention of Section 2229.

The Amended Complaint separately alleges that the Association has violated Article II, Section 10(b)(5) of the Declaration and Article V, Section 14 of the COR,[22] which state that "[t]he parking spaces . . . shall be available to Residential Unit Owners, their guests, invitees, etc., on a 'first come, first serve' basis" and parking areas "shall be available for use on a non-exclusive basis by the Unit Owners and their respective guests and invitees on a 'first-come, first-serve' basis . . . ." Am.

---

[22] The Amended Complaint also alleges violations of Article II, Section 11(a); Article II, Section 11(t); Article II, Section 18; and Article II, Section 25 of the Declaration; and Article V, Section 8; Article V, Section 15; Article XII, Section 1; and Article III, Section 2 of the COR. *See* Am. Compl. ¶¶ 32(b)–(e); *id.* ¶¶ 34(a), (c)–(e). Because the Amended Complaint states claims for violation of other provisions of the Governing Documents, those additional theories of breach need not be addressed at this stage. *See inVentiv Health Clinical, LLC v. Odonate Therapeutics, Inc.*, 2021 WL 252823, at *4 (Del. Super. Jan. 26, 2021, revised Feb. 18, 2021) ("[A]t the pleading stage of a case, a trial judge is not a robed gardener employing Rule 12(b)(6) as a judicial shear to prune individual theories from an otherwise healthily pled claim or counterclaim.").

Compl. ¶¶ 32(a), 34(b); COR Art. V, § 14.  The Amended Complaint adequately alleges that the Association has rendered the Parking Spaces unavailable for use, even on a non-exclusive basis, by the Unit Owners or their guests, in violation of the Declaration and COR.

For these reasons, the Amended Complaint states a claim for violations of the UPA and Governing Documents.[23]

## C.    The Trespass Claim

Paragraphs 50 through 53 of the Amended Complaint allege that by erecting new fences and moving existing fences on Condominium property, Key has committed a continuing trespass.[24]   This claim fails because Plaintiffs do not exclusively "possess" the Condominium property over which Key allegedly has trespassed.

"The tort of trespass consists of entry onto real property without the permission of the owner." *Del-Chapel Assocs. v. Conectiv*, 2008 WL 1934503, at *3 (Del. Ch. May 5, 2008) (citing *Fairthorne Maint. Corp. v. Ramunno*, 2007 WL 2214318, at *5 (Del. Ch. July 20, 2007)).  To state a claim for trespass, Plaintiffs must allege that they have "lawful possession of the property" and that Key "entered

---

[23] Defendants' argument that "Plaintiffs lack standing to bring a claim under the Lease" misses the mark because Plaintiffs do not purport to bring claims under the Leases—rather, they purport to bring claims to enforce the UPA and Governing Documents.

[24] *See* Am. Compl. ¶¶ 50–53.

onto the [Plaintiffs'] land without consent or privilege.'" *Frye v. Est. of Raphaelson*, 2023 WL 5624717, at \*12 (Del. Ch. Aug. 31, 2023), *R. & R. adopted*, 2023 WL 5955577 (Del. Ch. Sept. 12, 2023).  The Delaware Supreme Court has adopted the definition of "possession" in Section 137 of the Restatement (Second) of Torts as one who:

> (a) is *in occupancy of land* with intent to control it, or (b) has been but no longer is in occupancy of land with intent to control it, if, after he has ceased his occupancy without abandoning the land, no other person has obtained possession as stated in Clause (a), or (c) has the right as against all persons to immediate occupancy of land, if no other person is in possession as stated in Clauses (a) and (b).

*State ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372, 388 (Del. 2023) (emphasis added) (quoting Restatement (Second) of Torts § 157).  "The Second Restatement defines 'occupancy' as 'acts done upon the land as manifest a claim of *exclusive control* of the land . . . .'" *Id.* (quoting Restatement (Second) of Torts § 157 cmt. a).

Plaintiffs do not, and cannot, allege that they have exclusive control of the Parking Spaces.  Indeed, the COR expressly states that the parking areas "shall be available for use on a *non-exclusive basis* by the Unit Owners and their respective guests and invitees . . . ."  COR Art. V, § 14 (emphasis added).  Without allegations that Plaintiffs lawfully occupied the Parking Spaces by exclusively controlling them, Plaintiffs cannot bring a claim for trespass, even if the Leases are invalidated.

24

## III. CONCLUSION

For the reasons explained above, Plaintiffs' claims for breach of fiduciary duty and trespass are dismissed. The motions to dismiss are otherwise denied. The parties are directed to submit a form of implementing order.